Jean A. HOLLOCK, Appellee,

v.

ERIE INSURANCE EXCHANGE,
Appellant.

Superior Court of Pennsylvania.

Argued Sept. 4, 2003.

Filed Jan. 22, 2004.

Daniel B. Huyett, Reading, for appellant.

Timothy G. Lenahan, Scranton, for appellee.

Before: DEL SOLE, P.J., JOHNSON, HUDOCK, FORD ELLIOTT, MUSMANNO, TODD, KLEIN, BENDER and BOWES, JJ.

DEL SOLE, P.J.

¶ 1 Erie Insurance Exchange (Erie) filed this appeal from the judgment entered following a non-jury verdict in favor of Jean A. Hollock on her claim of insurance bad faith. *See* 42 Pa.C.S.A. § 8371. In its brief to this Court, Erie contends that Hollock's evidence was insufficient to sustain a finding of bad faith, and that the court misapplied controlling caselaw, entered the verdict in opposition to the weight of the evidence, and granted excessive punitive damages. Upon review, this Court listed the matter for consideration by an *en banc* panel and asked the parties to brief and argue the impact of *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), regarding the award of punitive damages. Following a careful examination of the briefs filed by the parties as well as the *amici curiae* briefs filed in support of both parties' positions, we conclude that Erie has failed to demonstrate reversible error. Accordingly, we affirm the judgment of the trial court.

¶ 2 Hollock was a named insured under a policy of automobile insurance issued by Erie effective March 22, 1992, for a period of one year. Hollock's limit of coverage was $500,000 per person/$1,000,000 per accident, and her policy included uninsured/underinsured (UM/UIM) motorist benefits. On June 8, 1992, Hollock was

struck from behind and injured by a third-party driver. As a result of the collision, Hollock suffered cubital tunnel syndrome, which impaired motor control in her dominant hand and arm, affecting her ability to perform the clerical job at which she was employed. Although Hollock underwent surgery to correct the condition, she did not achieve a complete recovery and remained unable to carry out some aspects of her job. Erie paid Hollock's claims for first-party medical benefits and Hollock, through counsel, then sought compensation from the third party's insurance carrier, Allstate. With Erie's consent, Hollock eventually settled her liability claim for an amount under Allstate's $100,000 coverage limit.

¶ 3 Thereafter, on March 5, 1996, Hollock's counsel provided Erie written notice of a UIM claim under her own policy, and two days later, Erie assigned the claim to adjuster Kirk Space. In correspondence, Hollock's counsel enclosed an old declaration sheet which reflected only $250,000 in UIM coverage. Space did not advise counsel as to the correct coverage amount of $500,000 and misled counsel to believe that the coverage was only $250,000 during the relevant time period. Upon receipt of this claim, Space preliminarily established the reserve value of Hollock's claim at only $30,000, which acted to "reserve" or set aside that amount of funds as sufficient to pay all losses on the claim. Space then requested, and Hollock provided, information necessary to evaluate her injury, including her medical records and projection of lost wages, which exceeded $100,000. Space did not, subsequently, request an independent medical examination or investigate Hollock's wage loss claim. Although Erie's first-party adjuster had accepted a causal relationship between Hollock's injuries and her 1992 accident and paid her first-party claims for medical care, Space

declined to recognize her claim for UIM benefits, citing a lack of causation.

¶ 4 Fourteen months later, on May 1, 1997, Space first requested a written demand from Hollock's counsel. Within approximately one week, counsel responded with documentation of Hollock's injury in the form of medical records and bills, deposition transcripts, and reports of Hollock's projected wage loss, and presented a settlement demand for $450,000. Erie rejected counsel's demand and secretly obtained a private investigator to place Hollock under surveillance. On July 14, 1997, Erie made its only offer to settle the claim in the amount of $30,000, consistent with the reserve Space established prior to Hollock's documentation of her injury and loss. Hollock rejected Erie's offer and the parties proceeded to contract arbitration. Following review of the parties' evidence, the arbitrators entered a gross award for Hollock of $865,000, well in excess of Hollock's policy limits and approximately 29 times the amount of Erie's settlement offer. Thereafter, Erie tendered payment up to its policy limit.

¶ 5 Hollock then commenced this bad faith action based on Erie's failure to investigate, process and satisfy her claim within a reasonable time following her notice of claim in March 1996. In her complaint, Hollock alleged that Erie had engaged in dilatory and abusive claims handling by, *inter alia*, failing to schedule timely medical examinations, asserting defenses without a reasonable basis in fact, forcing the plaintiff to arbitration on a clear claim and then delaying the arbitration hearing, and retaining defense-oriented experts to provide biased opinions not supported by evidence. Hollock also alleged that Erie had attempted to "lowball" her in settlement negotiations.

¶ 6 In December 2001, Hollock's bad faith claim proceeded to a non-jury trial

before the Honorable Peter Paul Olszewski, Jr., in the Court of Common Pleas of Luzerne County. Following an extended trial, the court determined that Erie had engaged in bad faith as provided by 42 Pa.C.S.A. § 8371. Accordingly, the court awarded compensatory damages, including attorneys' fees, of $278,825.90, and punitive damages of $2,800,000.

¶ 7 In support of its decision, the trial court provided exhaustive findings of fact and conclusions of law documenting the evidence of Erie's conduct and demonstrating its violation of the foregoing statute. From a total of 169 findings of fact the court highlighted five that it described as "objective illustration[s] of Erie's disingenuous attempt to handle Ms. Hollock's UIM claim." First, the court referred to its factual conclusion that for over a year, Space misled Hollock's counsel regarding the correct coverage amounts. Findings of Fact and Conclusions of Law, (Findings/Conclusions), 1/7/02, at 10, ¶ 45. The court also found the $30,000 reserve was an arbitrary figure set by Space without any rational basis. *Id.* at 14, ¶ 62. As a third point, the trial court noted that Erie had received several pieces of information which should have caused it to reevaluate the value of the claim, yet, without any contrary medical or vocational evidence, it failed to do so. *Id.* at 23, ¶ 93. The court also highlighted the fact that Space failed to follow up with and intentionally ignored the information supplied by Ms. Durland, Hollock's supervisor at work who corroborated Hollock's claims regarding her limitations following the accident. *Id.* at 24, ¶ 97. As its fifth objective illustration of Erie's "disingenuous attempt to handle Ms. Hollock's UIM claim," the trial court referred to Space's inquires of Hollock made in May of 1997, as "ruse" to allow Erie time to place Hollock under surveillance and have the file submitted to an expert to challenge causation. *Id.* at 28–

29, ¶ 110. In over 100 additional conclusions of law, the court characterized Erie's conduct as "reckless," and determined that the practices in which Erie had engaged contravened this Court's holding in *Terletsky v. Prudential Property & Casualty Ins. Co.*, 437 Pa.Super. 108, 649 A.2d 680 (1994). The court denied Erie's post-trial motion and Erie filed this appeal.

¶ 8 Erie raises the following questions for our review:

A. Whether the trial court erred as a matter of law by basing its conclusion of bad faith under 42 Pa.C.S.A. § 8371 on evidence concerning Erie Insurance Exchange's conduct during the bad faith litigation itself?

B. Whether the trial court misapplied the holding of *Terletsky v. Prudential Prop. & Cas. Ins. Co.* and erred as a matter of law by concluding that Erie Insurance Exchange acted in bad faith?

C. Whether the trial court's conclusion that Erie Insurance Exchange acted in bad faith is against the weight of the evidence?

D. Whether the trial court erred as a matter of law by awarding punitive damages?

E. Whether the trial court's award of punitive damages is grossly excessive and must be reduced so that it bears a reasonable relationship to the facts of record?

Appellant's Brief at 4.

¶ 9 All of Erie's questions on appeal challenge the trial court's findings and conclusions following a non-jury trial. Our review in a non-jury case is limited to "whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law." *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378,

380 (Pa.Super.2002). We must grant the court's findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the non-jury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. *See Terletsky,* 649 A.2d at 686. It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the factfinder. *See Bonenberger,* 791 A.2d at 381. Thus, the test we apply is "not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion." *Bergman v. United Servs. Auto. Ass'n,* 742 A.2d 1101, 1104 (Pa.Super.1999).

¶ 10 In its first question, Erie asserts that the trial court erroneously based its determination of bad faith on the conduct of the company and its employee-witnesses during trial of the bad faith claim. Appellant's Brief at 19. Erie argues that two recent panel decisions of this Court proscribe consideration of an insurer's conduct during bad faith litigation as evidence of its treatment of the underlying claim. *Id.* (citing *O'Donnell v. Allstate Ins. Co.,* 734 A.2d 901 (Pa.Super.1999) and *Ridgeway v. United States Life Credit Life Ins. Co.,* 793 A.2d 972 (Pa.Super.2002)). We reject Erie's interpretation of applicable law.

¶ 11 Pennsylvania law defines the bad faith cause of action as follows:

**§ 8371. Actions on insurance policies**
In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371. In both *O'Donnell* and *Ridgeway,* we considered whether conduct of the respective insurers surrounding bad faith litigation was conduct "arising under an insurance policy" as set forth in the opening sentence of § 8371. *See O'Donnell,* 734 A.2d at 901; *Ridgeway,* 793 A.2d at 972. Although in both cases, we determined that the insurer's particular conduct was not admissible as evidence of bad faith, in neither case did we announce a "bright line" rule that an insurer's actions in the bad faith litigation are not admissible in support of the bad faith claim.

¶ 12 In *O'Donnell,* a named insured on a policy of property and casualty insurance commenced an action following the insurer's failure to pay a claim for property loss after the insured's home was burgled. The insurer did not deny the claim, but engaged in investigative practices that the insured considered arbitrary and oppressive. Consequently, the insured commenced the underlying action asserting claims of breach of contract, bad faith, and violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law. Two of the insured's claims arose from the insurance company's conduct in defense of the lawsuit. The insured argued specifically that the company issued frivolous interrogatories questioning repairs and renovations to the burgled property and failed either to accept or deny her claim

after she submitted to a lengthy deposition.

¶ 13 In response to the arguments raised in *O'Donnell*, we recognized that "[t]he plain language of the [sic] section 8371 clearly reveals the lack of any restrictive language limiting the scope of bad faith conduct to that which occurred prior to the filing of a lawsuit." *O'Donnell*, 734 A.2d at 906. We opined further that "the broad language of section 8371 was designed to remedy all instances of bad faith conduct by an insurer, whether occurring before, during or after litigation." *Id.* Therefore, we acknowledged that "[a]n action for bad faith may also extend to the insurer's investigative practices," *id.*, and held that "the conduct of an insurer during the pendency of litigation may be considered as evidence of bad faith under section 8371." *Id.* at 907. Significantly, however, we expressed skepticism concerning the degree to which discovery practices undertaken in a bad faith action could support the claim for bad faith. Rather, we suggested that a party who believes it has been subject to improper discovery should pursue the exclusive remedy provided in the Pennsylvania Rules of Civil Procedure and file a motion for protective order. Accordingly, we refused to recognize the insurer's discovery practices as grounds for a bad faith claim under section 8371.

■ ¶ 14 Erie contends that our decision in *O'Donnell* establishes that "the only conduct relevant to a bad faith claim is the insurer's conduct 'as an insurer,' so that once the claim for insurance benefits is resolved, the insurer's subsequent conduct cannot be evidence of bad faith." Appellant's Brief at 19. We find this interpretation of *O'Donnell* overbroad and unsupported by the facts of that case. Nothing in our opinion indicates that resolution of the benefits claim should limit the admissibility of new evidence of bad faith

to establish a bad faith claim. Although, as Erie argues, we did opine that section 8371 provides a remedy for bad faith conduct "by an insurer in its capacity as an insurer and not as a legal adversary," *see O'Donnell*, 734 A.2d at 909 (citing *Slater v. Liberty Mut. Ins. Co.*, 1999 WL 178367 (E.D.Pa.)), we did not craft our holding as restrictively as Erie suggests. While we declined to consider the insurer's discovery practices as further evidence of bad faith, we so held expressly because these practices were subject to an exclusive remedy under the Rules of Civil Procedure. *See O'Donnell*, 734 A.2d at 909. We specifically noted that absent from the plaintiff's claim was evidence demonstrating that the insurer "was motivated by a dishonest purpose or ill motive, or otherwise breached it[s] fiduciary or contractual duty by utilizing the discovery process to conduct an improper investigation." *Id.* at 909. We noted that all the instances of alleged bad faith could have been ameliorated had the plaintiff/claimant merely sought a protective order under the discovery rules. *See id.*

¶ 15 Unlike *O'Donnell*, this case involves conduct engaged in during the litigation of the bad faith claim that far exceeded mere discovery matters. The trial court has characterized these actions as "an intentional attempt to conceal, hide or otherwise cover-up the conduct of Erie employees." Findings/Conclusions, at 83, ¶ 80. Because the Rules of Civil Procedure provide no remedy if, as the trial court concluded here, an insurer's witnesses engage in "a blatant attempt to undermine the truth finding process," *id*, we do not find *O'Donnell* controlling.

¶ 16 Erie relies also on our decision in *Ridgeway*, again asserting that section 8371 does not apply, as a matter of law, to an insurer's conduct after the payment of a claim for insurance benefits. Appellant's

Brief at 19–20. Erie argues that because it had paid the benefits due Hollock on the underlying UIM claim when the current bad faith action was tried, its conduct during trial cannot be deemed bad faith. Appellant's Brief at 20. Again, we reject Erie's interpretation as overbroad.

¶ 17 In *Ridgeway,* we considered whether an action the plaintiff commenced to enforce a judgment on a bad faith claim was itself an "action arising under an insurance policy" such as to avail the plaintiff of the remedies prescribed by section 8371. *See* 793 A.2d at 972. Upon review of the statutory language, we concluded that "in an action arising under an insurance policy means that the insured's cause of action must originate from a writing setting forth an agreement between the insured and insurer that the insurer would pay the insured upon the happening of certain circumstances." *Id.* at 976. We held accordingly that the scope of section 8371 does not include the conduct of insurer after judgment or settlement in a first bad faith action. Because Ridgeway brought her action as a judgment creditor and not as a claimant under the terms of the insurance contract, we concluded that the action was not encompassed under section 8371. *See id.* at 976–77. The creditor's attempts to collect after the insured refused to pay the judgment in the underlying bad faith action was held not to be an action arising under an insurance policy.

 ¶ 18 In contrast, this action does not concern conduct of the Insurer following the conclusion of the litigation of a bad faith claim; it is a claim seeking recovery based upon Erie's bad faith conduct in relation to payment under the insurance contract. Bad faith will be shown where an insurer has for a frivolous or unfounded reason refused to pay the proceeds of a policy to its insured. *Terletsky,* 649 A.2d 680. This is so because an insurer has a duty to act with the utmost good faith towards its insured. *Romano v. Nationwide Mut. Fire Ins. Co.,* 435 Pa.Super. 545, 646 A.2d 1228 (1994). The breach of the obligation to act in good faith "constitutes a breach of the insurance contract." *The Birth Ctr. v. The St. Paul Cos.,* 567 Pa. 386, 787 A.2d 376, 385 (2001) (citing *Gray v. Nationwide Mut. Ins. Co.,* 422 Pa. 500, 223 A.2d 8, 12 (1966)). Thus, this claim of bad faith, unlike the claim made in *Ridgeway,* is based upon a breach of the underlying insurance contract. Therefore it was appropriate for the court to consider Erie's continued conduct in relation to its insured.

 ¶ 19 In its second question, Erie challenges the trial court's application of the standard of proof for bad faith espoused in *Terletsky,* 649 A.2d at 686. Appellant's Brief at 21–43. Erie argues that "if the record reflects an objectively reasonable basis for the insurer's actions, the plaintiff cannot prove bad faith as a matter of law, and a conclusion of bad faith in the face of such evidence must be reversed as legal error[.]" *Id.* at 23. Thus, Erie seeks to impeach the trial court's decision by reference to the trial transcript, citing its own oral testimony to establish a "reasonable basis" for its actions regarding Hollock's UIM claim. *Id.* at 24–43. Significantly, however, Erie fails to recognize that the veracity of its testimony need not have been accepted by the trial court which, sitting as fact-finder, was the sole judge of credibility. *See Bonenberger,* 791 A.2d at 381. The trial court was free to discount or disregard Erie's testimony in its entirety, and did so. The trial court specifically found that "most of the testimony of Erie employees was an intentional attempt to conceal, hide or otherwise cover-up the conduct of Erie employees in the handling of the Hollock claim." Findings/Conclusions at 82, ¶ 80. Consequent-

ly, we are compelled to reject Erie's argument as a thinly veiled attempt to impugn the trial court's legal conclusions on the basis of evidentiary weight. Because we as an appellate court cannot weigh evidence, *see Bonenberger*, 791 A.2d at 381, we will not address Erie's assertion that its testimony established a "reasonable basis" for its actions. To the extent that Erie's discussion posits a bona fide legal argument based on *Terletsky*, we find that case limited to its facts and therefore distinguishable.

¶ 20 In *Terletsky*, we considered the cross-appeal of an insurer to determine whether the trial court's findings of fact where supported by competent evidence. *See* 649 A.2d at 680. The court had determined that the insurer, Prudential Property and Casualty Insurance Company, engaged in bad faith when it refused to pay an award in contract arbitration after its earlier refusal to pay the insured's claim for stacked benefits under UIM coverage. The record reflected, however, that the insurer had acted, in both instances, in reliance on previously valid caselaw that held stacking was not permitted. *See id.* at 682–83 (citing *Chartan v. Chubb Corp.*, 725 F.Supp. 849 (E.D.Pa.1989)). Citing the "unsettled" state of the law when Prudential refused payment of the arbitration award, we concluded that the company had a "reasonable basis" in law for refusing to pay the insured's claim. Stated differently, the unsettled state of the law on stacking effectively precluded a showing by the insured that the insurer acted in bad faith when it refused to honor a claim for stacked benefits. We determined accordingly that the insured could not establish bad faith as a matter of law. *See id.* at 690.

¶ 21 In this case, Erie concedes that it decided not to pay Hollock's UIM claim on the basis of its adjuster's determination of valuation, Appellant's Brief at 25, and its dispute concerning the cause of Hollock's injuries. *Id.* at 27–30. Unlike the considerations of unsettled law at issue in *Terletsky*, both of these points of dispute are inherently factual and are subject to the trial court's determination of credibility. *See Bonenberger*, 791 A.2d at 381. Unlike the circumstances in *Terletsky*, there is no point of law raised in this case on which Erie can rely to preclude a showing of bad faith. Erie's offer of evidence in support of its position that it acted reasonably, was specifically rejected by the trial court acting as fact-finder. The trial court concluded, based upon its specific factual findings and credibility determinations, that Erie did not act reasonably in investigating, evaluating and paying Hollock's claim. Erie's recitation of its own countervailing evidence which was not accepted by the trial court cannot undermine Hollock's proof of bad faith. Accordingly, we find no merit in Erie's second question.

 ¶ 22 In its third issue, Erie challenges the weight of the evidence directly, contending that Hollock failed to establish her claim by the requisite "clear and convincing" standard. Appellant's Brief at 43.

> [O]ur scope of review on a weight of the evidence claim is very limited. We will respect the trial court's findings with regard to credibility and weight of the evidence unless it can be shown that the lower court's determination was manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence.

*Gemini Equipment Co. v. Pennsy Supply, Inc.*, 407 Pa.Super. 404, 595 A.2d 1211, 1215 (1991). Thus, "our function is to examine the trial court's exercise of discretion and determine if there has been an abuse." *Commonwealth v. Ragan*, 439 Pa.Super. 337, 653 A.2d 1286, 1287 (1995).

"We are not free to answer the underlying question of whether we believe that the verdict is against the weight of the evidence." *J.F. Walker Co. Inc. v. Excalibur Oil Group, Inc.*, 792 A.2d 1269, 1272 (Pa.Super.2002). Rather, we must review the court's findings and reasons in light of the evidence adduced "only to ensure that the trial judge exercise[d] the duties, yet respecte[d] the confines of his or her particular role in the trial proceeding." *Ragan*, 653 A.2d at 1287–88. "This distinction is a fine one, but a very important one; it allows us to correct a palpable abuse of discretion while ensuring that we will not substitute our judgment for that of the [fact-finder]." *Id.* at 1287.

¶ 23 Following careful review of the record compiled at the non-jury trial, we conclude that the trial court acted well within its judicial discretion in determining that Hollock established bad faith by "clear and convincing evidence." In 169 Findings of Fact spread over 50 pages, the court provided an exhaustive discussion of the evidence proffered by both parties, noting expressly whether it found the evidence credible. In its 106 additional Conclusions of Law, the court recognized the controlling standard of proof, as well as statutory authority, the definition of bad faith applied in *Terletsky*, and other case authority. The care with which the court sifted an overwhelming body of evidence is amply demonstrated in the specificity of its observations which, although drawn from contested evidence, are amply supported by the record. Erie's scant assertion that the court drew inferences in favor of Hollock fails to establish any basis for a finding of reversible error in light of so probing a discussion from the trial court. Consequently, we find no merit in Erie's assertion that the court delivered the verdict in opposition to the weight of the evidence.

¶ 24 In its fourth question, Erie asserts that the court erred as a matter of law in awarding punitive damages. Appellant's Brief at 44. The company argues that an award of such damages, even in a bad faith action, may not be sustained unless the plaintiff proves both bad faith conduct as defined in *Terletsky*, and "aggravating circumstances beyond those that justif[y] the award of compensatory damages." *Id.* at 45 (quoting *Pittsburgh Live, Inc. v. Servov*, 419 Pa.Super. 423, 615 A.2d 438, 442 (1992)). These circumstances, Erie contends, include "acts of malice, vindictiveness, and a wholly wanton disregard for the rights of others." Appellant's Brief at 45 (quoting *Servov*, 615 A.2d at 442). This contention is specious.

¶ 25 Initially, we note that Erie's reliance on *Servov* is misguided. In *Servov*, we addressed a claim of common law fraud, without reference to a bad faith claim under section 8371. *See id.* at 441. Accordingly, our decision in that case is of no persuasive value on this statutory claim of bad faith. Rather, our focus is properly directed to the statutory language.

¶ 26 Section 8371, which creates the cause of action for insurance bad faith, specifically empowers the trial court to award punitive damages "if the court finds that the insurer has acted in bad faith toward the insured[.]" 42 Pa.C.S.A. § 8371. The statute provides no other language suggesting a pre-condition for the award of punitive damages. Thus, by statutory mandate, a finding of bad faith is the only prerequisite to a punitive damages award under section 8371. *See Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 812 A.2d 1218 (2002) (reaffirming doctrine of statutory construction that inclusion of a specific matter in a statute implies the exclusion of other matters). Moreover, this Court has suggested that the elements of proof necessary to

establish a claim for punitive damages under this section are co-extensive with those that establish the bad faith claim itself. *See Alberici v. Safeguard Mut. Ins. Co.,* 444 Pa.Super. 351, 664 A.2d 110, 115 (1995) (concluding that trial court properly denied claim for punitive damages under section 8371 "[b]ecause there was no evidence of bad faith to support an award of punitive damages"). This is not incongruous, given the similarity in elements required for a common law claim of punitive damages to those required to show statutory bad faith. *Compare Costa v. Roxborough Mem'l Hosp.,* 708 A.2d 490, 497 (Pa.Super.1998) (prescribing "reckless indifference to the rights of others" as basis for imposition of punitive damages) *with Terletsky,* 649 A.2d at 687 (incorporating element of reckless conduct into definition of bad faith). Although we recognize, as Erie argues, that a finding of bad faith does not compel an award of punitive damages, it does **allow** for the award without additional proof, subject to the trial court's exercise of discretion. *See* 42 Pa.C.S.A. § 8371. Accordingly, we find no merit in Erie's assertion that the trial court erred in not imposing a two-tiered standard of proof to sustain an award of punitive damages under section 8371.

¶ 27 In its fifth and final question, Erie challenges the amount of the punitive damages award, contending that the 2.8 million dollar amount was "grossly excessive." Appellant's Brief at 47. Erie argues that the award "does not bear a reasonable relationship to the factors the trial court was bound to consider." *Id.* In its supplemental brief, Erie contends that under the United States Supreme Court's recent decision in *State Farm v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585, the punitive damage award was unconstitutionally excessive. Supplemental Brief for Appellant at 16. Following consideration of the trial court's findings and conclusions in view of applicable law, we find this assertion unsubstantiated.

¶ 28 Under Pennsylvania law the "size of a punitive damages award must be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion." *Shiner v. Moriarty,* 706 A.2d 1228, 1241 (Pa.Super.1998). In accordance with this limitation, "[t]he standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant." *Pioneer Comm. Funding Corp. v. Am. Fin. Mortg. Corp.,* 797 A.2d 269, 290 (Pa.Super.2002).

¶ 29 In this case, the trial court recognized expressly that "a reasonable relationship must exist between the amount of the punitive damage award and the twin goals of punishment and deterrence, the character of the tortious act, the nature and extent of the harm suffered by the plaintiff and the wealth of the defendant." Findings/Conclusions, at 86, ¶ 94. The court addressed each of these elements in detail.

¶ 30 Concerning the character of Erie's conduct, the court found "deliberate indifference and, in some cases, blatant dishonesty, exhibited by Erie and its employees," and documented specific instances of such conduct throughout its Findings and Conclusions. *Id.* at 88, ¶ 103. The court determined that Erie misrepresented the amount of Hollock's coverage, established an arbitrary reserve with "absolutely no relationship" to available loss documentation, discounted Hollock's projected wage loss projections without supporting medical or vocational evidence, refused to contact Hollock's employer to determine the

extent of her inability to complete assigned tasks, and refused to pay Hollock's claim for UIM benefits although it had previously accepted and paid her first-party claims arising from the same accident. *Id.* at ¶¶ 45, 62, 93, 97, and 110. Ultimately, the court characterized Erie as "a company run [amok]," whose supervisory personnel "sanction[ed] deceit" in the service of a "corporate belief that it is acceptable to tell a little lie so long as no one really gets hurt." *Id.* at 47, ¶ 158 and 88, ¶ 103. .

¶ 31 Concerning the nature and extent of the plaintiff's harm, the court determined that Jean Hollock suffered a bona fide disability as a result of a covered injury, and was deprived by Erie of the only available measure of compensation for a period of years. The court recognized expressly that Hollock suffered an invasion of a "legitimate health interest" to serve Erie's financial goals and was subjected to unwarranted surveillance and unnecessary litigation. *Id.* at 59, ¶¶ 34(d) and 79, ¶ 67.

¶ 32 Concerning the wealth of the defendant, the trial court considered the unrefuted testimony by Hollock's economist that documented both Erie's net income and its net worth. *Id.* at 87–89, ¶¶ 97–103. The court concluded that given Erie's "vast net worth," averaging 4.8 billion dollars between 1996 and 2000, only a substantial award of punitive damages would deter the kind of bad faith conduct so amply demonstrated. *Id.* at 88, ¶ 103. The court remained cognizant, however, of Erie's continuing need to meet its obligations to its other insureds. *Id.* at 87, ¶ 98.

¶ 33 While we perceive of no abuse of discretion in the trial court's ruling based upon its specific findings, we must nevertheless undertake further review of the award to determine whether it comports with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. While a decision to punish a tortfeasor by exacting punitive damages is an exercise of State power, it must nevertheless comply with constitutional due process concerns. *Pioneer Commercial Funding Corp. v. American Financial Mortg. Corp.*, 797 A.2d at 292. "Because punitive damages pose an acute danger of arbitrary deprivation of property, due process requires judicial review of the size of punitive damage awards." *Id.*

¶ 34 In *State Farm v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585, the United States Supreme Court reviewed a $145 million punitive damages award. Finding that the award was excessive and disproportionate to the wrong committed, the Court ruled it constituted an unconstitutional deprivation of the insurer's property. The Court noted that, although states possess discretion over the imposition of punitive damages, there are procedural and substantive constitutional limitations on these awards. *Id.* at 1519. The Court cautioned that the due process clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments. *Id.* at 1520. While finding that punitive damages are aimed at deterrence and retribution, *id.* at 1519, the United States Supreme Court advised reviewing courts to consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 1520, (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 560–61, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).

¶ 35 The Court in *Campbell* reiterated that the "most important indicium of the reasonableness of a punitive damages

award is the degree of reprehensibility of the defendant's conduct." *Campbell*, 123 S.Ct. at 1521. In *Campbell*, the Court was critical of the state court's condemnation of the insurer for its nationwide policies, rather than for conduct directed toward its individual insured.

¶ 36 In this case, the trial court appropriately focused on Erie's misconduct toward its insured, Hollock, and found that it should be punished for its outrageous conduct and repeated acts of reckless indifference toward Hollock. In its extensive findings, which are supported by the evidence, the trial court recounts numerous incidents which caused it to conclude that Erie "embarked on a course to deny Plaintiff her due compensation, without a reasonable basis." Finding/Conclusions, at 61 ¶ 37. The trial court found that Erie engaged in affirmative acts of misconduct and concealment of evidence of its improper motive, which was in violation of Erie's own claims handling procedures.

¶ 37 When examining the second guidepost: the disparity between actual or potential harm suffered by the plaintiff and the punitive damage award we first note that the United States Supreme Court has expressly rejected the assertion that a punitive damages award must bear a certain proportionality to the amount of compensatory damages. *Campbell*, 538 U.S. 408, 123 S.Ct. 1513. It noted that in the past it had been "reluctant to identify concrete constitutional limits on the ratio between harm or potential harm to the plaintiff and the punitive damages award," and that it "decline[d] again to impose a bright-line ratio." *Campbell*, 123 S.Ct. at 1524.

■■■ ¶ 38 Although refusing to set forth a "bright line" the Court did remark "that, in practice few awards exceeding a single-digit ratio will satisfy due process." *Id.* The Court went on to clarify that "because there are no rigid benchmarks," ... "ra-

tios greater than those we have previously upheld may comport with due process." *Id.* Where a particularly egregious act results in only a small amount of economic damages a greater ratio may be accepted. However, the Court found that the converse will also be true: where a substantial compensatory damage award is made, a lesser ratio may be all that is constitutionally acceptable. *Id.* In *Campbell*, the court ruled that there was a presumption against the award before it which had a 145-to–1 ratio in an instance where a substantial $1 million compensatory award was made for emotional distress.

¶ 39 The large compensatory award in *Campbell* was viewed by the Court as reducing the need to award a large amount of punitive damages to provide an effective remedy. *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672 (7th Cir.Ill.2003), (citing *Campbell* ). However, where the compensatory award is small in spite of the defendant's egregious conduct, it may be appropriate to award a larger amount of punitive damages to limit the defendant's ability to profit from its action and to deter further misconduct. *Mathias*, at 677–78. The defendant's wealth may in such an instance become relevant, for its large resources may enable the defendant to mount an extremely aggressive defense, which in turn can prove very costly to a plaintiff and potentially deter it from pursuing the matter. *Id.* (noting that a defendant's aggregate net worth of $1.6 billion became relevant in deciding to uphold a $186,000 punitive damage award, where the compensatory damage award was only $5,000, a 37.2–to–1 ratio.)

¶ 40 In this case the compensatory damages in the bad faith action were limited to attorneys' fees, costs and interest, totaling about $278,825. Unlike the compensatory award in *Campbell* which permitted recovery for emotional distress, the compensato-

ry award in this case did not include any punitive element. The punitive damages here of $2.8 million represent a 10 to 1 ratio over the compensatory award, which just barely exceeds the "single digit ratio" referred to in *Campbell. Campbell,* 123 S.Ct. at 1524. Considering Erie's reprehensible conduct, its significant wealth, and the limited compensatory award, we conclude that due process is not violated in this case as a result of the disparity between actual or potential harm suffered by the plaintiff and the punitive damage award.

¶ 41 *Campbell* also advises the court to examine "the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'" *Campbell* 123 S.Ct. at 1526 (citing *BMW of North America, Inc. v. Gore,* 517 U.S. at 575, 116 S.Ct. 1589). Admittedly, the trial court in this case noted that it was not making a specific finding as to whether Erie violated any certain statutory provisions. The court did however set forth a number of specific provisions and contrasted and compared their dictates to Erie's conduct in the handling of Hollock's claim. See Findings/Conclusions, at 63–65, ¶¶ 41–48. The court referred to specific provisions of the Unfair Insurance Practices Act, 40 P.S. §§ 1171.1–1171.15, and identified the conduct of Erie which would apply to constitute an unfair or deceptive act or practice, as defined in the Act. *Id.;* 40 P.S. § 1171.5(a) (10). Under the terms of the Act, the Commissioner may impose a penalty of up to $5000, for each known violation. 40 P.S. § 1171.11. In addition, upon a determination that the Act has been violated, the Commissioner may suspend or revoke the offender's license. § 1171.9. In view of these potentially harsh penalties faced by Erie, we cannot find the punitive damages award unjustified and violative of due process.

¶ 42 Given the court's extended analysis of Erie's conduct, in view of all the relevant factors, we find no basis to disturb the punitive damages award. For the foregoing reasons, we affirm the judgment of the trial court in favor of Jean A. Hollock.

¶ 43 Judgment affirmed.

¶ 44 KLEIN, J. files a dissenting opinion, in which HUDOCK, J. joins.

KLEIN, J., Dissenting.

¶ 1 I respectfully dissent from the majority and would remand for a new trial for three reasons:

1. I believe it was error for the trial court to rely upon Erie's behavior during the bad faith action after the underlying policy limits were paid.
2. I believe no pattern of improper behavior was attributable to Erie other than the actions involved in this matter.
3. The trial judge rendered its decision before the United States Supreme Court decision in *State Farm v. Campbell,* [538 U.S. 408] 123 S.Ct. [1513]1512 [155 L.Ed.2d 585] (2003) and therefore did not consider the *Campbell* factors when reaching its decision.

**Actions during the bad faith litigation**

¶ 2 It is clear from Conclusion of Law # 103 that the trial court relied impermissibly on Erie's actions during the bad faith trial to determine bad faith and the applicability of punitive damages. The trial court stated:

Further, in awarding punitive damages, this court has considered, at great length, the conduct of Erie and its employees not only during the pendency of the Hollock UIM claim, but, just as importantly, throughout the trial.

Findings of Fact and Conclusions of Law, p. 88 (1/7/02).

¶ 3 Our Court, in a matter of first impression, held that bad faith suits may extend to the conduct of an insurer during the pendency of litigation. *O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa.Super.1999). However, we later limited this concept in *Ridgeway v. U.S. Credit Life Ins. Co.*, 793 A.2d 972, 977–78, (Pa.Super.2002). In *Ridgeway,* we held that because the duty of good faith and fair dealing is extinguished once a settlement has been reached or a judgment entered, the insurer's fiduciary duty does not extend past that point. Thus, no bad faith can be imputed to the insurer for actions taken post-judgment or post-settlement.

¶ 4 It is undisputed that once the UIM arbitration award was entered and molded in November 1998, Erie paid the limits of the policy. Thus, any actions taken by Erie after that date cannot be considered to be bad faith. Hollock filed the bad faith action in October 1999, almost one year after the payment of the UIM claim. No action taken by Erie in defense of the bad faith claim can be considered in determining whether Erie committed bad faith in the investigation and handling of the underlying UIM claim.

¶ 5 Further, the United States Supreme Court in *State Farm v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), held that only conduct that relates to the bad faith harm should be considered when evaluating the appropriateness of punitive damages. The Supreme Court stated:

A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages.

*Id.* at 1523. In this case, the trial court apparently gave equal weight to Erie's actions during the bad faith trial, which is irrelevant, as it did to its actions in handling the underlying UIM claim. I believe this was improper and requires reversal.

## The amount of punitive damages

¶ 6 Because the trial court issued the Findings of Facts and Conclusions of Law before the United States Supreme Court decision in *Campbell,* it was not able to utilize that binding authority in formulating the award.

¶ 7 The guideposts for determining whether a punitive damage award is constitutionally excessive were initially set forth in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) and refined in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) and *Campbell, supra.*

¶ 8 As stated in *Campbell,* 123 S.Ct. at 1515, in reviewing punitive damages the appellate court must consider:

1. the degree of reprehensibility of the defendant's misconduct,

2. the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, and

3. the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

¶ 9 Under those guideposts, the punitive damages award cannot be supported by the conclusions of law as stated by the trial court. Thus, a new trial is necessary before a different judge.

## The degree of reprehensibility

¶ 10 While the facts as found by the trial court support a conclusion that there was a significant degree of reprehensibility in Erie's dealing with Hollock, this represents just the handling of a single claim.

As noted in *Campbell,* an award cannot be justified on the grounds that Erie was a recidivist. Just as there is "scant evidence" in *Campbell* that there was a pattern of behavior by the insurance company, there is scant evidence here that the excesses in the handling of this file were standard practice on the part of Erie.

**The disparity between the actual harm and the punitive damages award**

¶ 11 Because the amount of the claim involved was the policy limits of $500,000, I agree with the plaintiff that the approximately $280,000 in interest and attorney fees alone should not be considered in establishing the ratio. I believe $780,000 is a fairer figure. However, in examining the currents facts under the *Campbell* analysis, particularly considering that there is no evidence to show that this represents anything other than the mishandling of one file, the Supreme Court's comment, "[the degree of reprehensibility] likely would justify a punitive damages award at or near the compensatory damages amount." *Campbell,* 123 S.Ct. at 1526, is particularly relevant.

**The possible civil penalties**

¶ 12 Once again, absent proof of a pattern of this kind of behavior on the part of Erie, it is unlikely that the company would be suspended or that any significant fine would be imposed by the insurance department.

**The standard of review**

¶ 13 The United States Supreme Court held in *Cooper, supra,* that federal appellate courts must apply a *de novo* review standard when examining whether a punitive damage award is unconstitutionally excessive. *Id.* This is a major question we are now presented with. I do not believe *Cooper* stands for the proposition that we, appellate court judges, should ourselves fix the amount of punitive damages. We were not in the courtroom. We did not have the opportunity to observe the witnesses. We are not in a position to take testimony and assess credibility. I believe that it is our responsibility to take a fresh look at the record and apply the relevant factors to determine whether we view the evidence as sufficient to sustain the punitive damage award fixed by the trier of fact.

¶ 14 Following *Cooper,* there has been considerable consternation and confusion regarding the difference between a trial court reviewing the award of punitive damages as an abuse of discretion or conducting a *de novo* review. It is not only unclear what the precise difference between the two standards is, it is also unclear whether the *de novo* standard applies to the states. However, under either standard, I believe that *Cooper* requires a reversal of the trial court in this instance.

¶ 15 I do not believe that the Supreme Court mandated that the Courts of Appeals fix the punitive damages anew. Were those appellate courts to put a new figure on an award for punitive damages, they would, by necessity, have to conduct hearings, assess the credibility of witnesses and act as a trial court in making the determination. Rather than forcing an appellate court to abandon its traditional role as reviewer of a record, I interpret *Cooper* to mean that the appellate court should simply review each relevant factor to determine whether the punitive damage award assessed at trial is reasonable and supportable, not to reassess the award. This is what I propose here.

¶ 16 As noted by a number of judges and justices, the difference between a review based on abuse of discretion or a *de novo* review of the facts may be a distinction without a difference. Even the majority in *Cooper* stated its ruling could apply to only a relatively small number of cases. *Cooper,* 532 U.S. at 441, 121 S.Ct. 1678.

Justice Ginsberg, dissenting, stated: "But to the extent the inquiry is "legal" in character, there is little difference between review *de novo* and review for abuse of discretion." *Id.* at 448, 121 S.Ct. 1678. Nonetheless, I propose to follow *Cooper* and use the language of *de novo* review.

¶ 17 I believe that *Cooper* will apply to the Pennsylvania courts as well as the federal. In the majority opinion the reasoning behind the *de novo* standard is that punitive damages are akin to a criminal fine and therefore, constitutional safeguards must apply. While the *Cooper* majority noted that many states have passed legislation placing limits on the permissible size of punitive damage awards, Pennsylvania has not. The Pennsylvania Supreme Court has adopted the test that punitive damages must "shock the conscience" before they will be reduced. This standard has allowed for punitive damages that would be unacceptable under *Campbell.* Therefore, if there is no real judicial standard nor any legislative standard set to limit punitive damages, it appears that a *de novo* review is necessary to insure that the constitutional rights of the defendant are preserved. The Due Process Clause of the Fourteenth Amendment makes the Eighth Amendment's prohibition against excessive fines and cruel and unusual punishment applicable to the states. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (*per curiam* ); *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

¶ 18 Because I believe that the trial court has in no small measure based its decision to award punitive damages on improper factors, and because I believe this Court is in no position to reassess and recalculate the award of punitive damages, I must dissent from the majority. I would reverse the decision of the trial court and remand for a new trial.

¶ 19 HUDOCK, J. joins.