**Donegal Mutual Insurance Company v. Cipolla**

C.P. of Berks County, no. 01-3830.

*Jesse L. Pleet,* for plaintiff.
*Daniel E.P. Bausher,* for defendant.

STALLONE, *J.,* June 22, 2004—In this declaratory judgment action, we are being asked to decide whether the defendant, Lisa Cipolla, is entitled to recover

underinsured motorist benefits under an automobile insurance policy issued by the plaintiff, Donegal Mutual Insurance Company, to David A. Levan and Natalie Levan. The dispute between the parties arises out of a collision which occurred on February 10, 1998, involving a motor vehicle being driven by the defendant, Lisa Cipolla, but which had been rented by David A. Levan from Enterprise Rent-A-Car Inc., and a second motor vehicle being driven by Scott B. Werner.

And now, after a non-jury trial, at which time a series of stipulated facts was incorporated into the record by agreement of the parties, we enter the following findings of fact, discussion and conclusions of law in disposition of their respective claims.

## FINDINGS OF FACT

(1) On February 7, 1998, at approximately 11:50 a.m., David A. Levan rented a motor vehicle (the rental vehicle) from Enterprise Rent-A-Car Inc., located in Temple, Berks County, Pennsylvania.[1] N.T., trial, p. 16.

(2) At that time, Mr. Levan signed a written rental agreement dated February 7, 1998. N.T., trial, pp. 16-17.

(3) The defendant, Lisa Cipolla, was present on February 7, 1998, when Mr. Levan signed the rental agreement, but she did not review it. N.T., trial, pp. 16, 30.

(4) The defendant was not identified as an "Additional driver" of the rental vehicle in the February 7, 1998 rental agreement, as evidenced by the following language which

---

1. In the rental agreement which he signed on that date, Mr. Levan is named as the "renter" and Pennrac Inc., a wholly-owned subsidiary of Enterprise Rent-A-Car Inc., and Enterprise are (collectively) named as the "owner" of the rental vehicle.

appears in capital letters in the middle of the first page of the agreement:

"ADDITIONAL DRIVER—NONE PERMITTED WITHOUT ENTERPRISE'S APPROVAL" and under which appears the following typed words, again in capital letters:

"NO OTHER DRIVER PERMITTED." N.T., trial, pp. 18, 24.

(5) The first paragraph of the terms and conditions of the February 7, 1998 rental agreement, as it appears therein, provides that:

"RENTER AGREES BY HIS SIGNATURE ON THE FACE HEREOF THAT HE HAS READ AND IS AWARE OF THE FOLLOWING TERMS AND CONDITIONS CONCERNING THE USE OF THE VEHICLE AND ACCEPTS FULL RESPONSIBILITY HEREIN. This contract is the entire agreement between the renter and owner. It is agreed that these terms are contractual and cannot be altered by another document or oral agreement." N.T., trial, p. 16.

(6) Paragraph 13 of the terms and conditions of that agreement, as it appears therein, also specifically provides as follows:

"(13) VIOLATIONS OF THE CONTRACT. A violation of the contract shall exist if the car is used or driven:
. . .

"(e) By any person other than the renter without written consent of the owner." N.T., trial, p. 16.

(7) Mr. Levan understood that no additional drivers were permitted to use the rental vehicle, under the February 7, 1998 rental agreement, without Enterprise's permission. N.T., trial, pp. 18, 24.

(8) Mr. Levan returned the rental vehicle to Enterprise's Temple location on February 10, 1998, because it was not working properly, at which time he was accompanied by the defendant. N.T., trial, pp. 19, 29.

(9) Since Enterprise did not have another comparable rental car available at that location, Enterprise personnel made arrangements for Mr. Levan to exchange it for another vehicle located at Enterprise's Morgantown Road, Reading, facility. N.T., trial, pp. 19, 28.

(10) The defendant accompanied Mr. Levan to Enterprise's Morgantown Road facility to exchange the rental vehicle. N.T., trial, pp. 20, 28, 29.

(11) Upon his arrival, Mr. Levan executed an identical rental agreement dated February 10, 1998, for the replacement rental vehicle containing all of the same terms and conditions that are in the February 7, 1998 rental agreement, including the prohibition on the use of the replacement vehicle by any additional driver without Enterprise's permission. N.T., trial, p. 20.

(12) Mr. Levan knew that no additional drivers were permitted to use the replacement vehicle under the February 10, 1998 agreement without Enterprise's permission. N.T., trial, p. 24.

(13) The defendant was standing at the counter with Mr. Levan when he signed the rental agreement, but she did not review it. N.T., trial, pp. 20, 30.

(14) The defendant did not, nor did Enterprise personnel request her to, provide her driver's license, credit card or any other information to Enterprise personnel on February 10, 1998.[2] N.T., trial, pp. 21, 27.

___

2. The same is true for the original rental transaction on February 7, 1998.

(15) At no time on February 10, 1998, while the defendant and Mr. Levan were standing at the counter, did the defendant request or obtain permission from Enterprise personnel for her to drive the replacement vehicle. N.T., trial, p. 21.

(16) As a result, the defendant was not identified as an "Additional driver" in the February 10, 1998 rental agreement. N.T., trial, pp. 21, 24.

(17) After completing the paperwork, Mr. Levan and the defendant walked outside onto the parking lot, followed by an unidentified Enterprise employee who was walking behind them. N.T., trial, p. 22.

(18) This employee proceeded to walk toward the rental vehicle that they had returned and pointed them to the location where the replacement vehicle was parked, which was two parking spaces away. N.T., trial, pp. 21, 31, 33, 37, 39.

(19) The defendant did not engage in any conversation with this unidentified Enterprise employee at any time either inside or outside the facility. N.T., trial, p. 36.

(20) While Mr. Levan and the defendant were walking towards the replacement vehicle, Mr. Levan advised the defendant that he did not feel well and gave her the keys to the vehicle. N.T., trial, pp. 22, 31.

(21) The defendant proceeded to drive the replacement vehicle off of the parking lot, with Mr. Levan sitting in the front passenger seat of the vehicle, and onto the northbound lane of Morgantown Road towards the intersection of Morgantown Road and Lancaster Avenue. N.T., trial, pp. 23, 35.

(22) The Enterprise employee who had followed Mr. Levan and the defendant onto the parking lot allegedly

waved to them as the defendant was driving the vehicle off of the parking lot onto Morgantown Road. N.T., trial, p. 35.

(23) Shortly thereafter, while the defendant and Mr. Levan were stopped at the intersection of Morgantown Road and Lancaster Avenue, a second vehicle being driven by Scott B. Werner struck the rear of the replacement vehicle, causing the defendant to sustain personal injuries. N.T., trial, pp. 23, 36.

(24) At the time of the collision, Scott B. Werner maintained an automobile liability insurance policy with a maximum limit of $15,000. N.T., trial, p. 3.

(25) Following that incident, the defendant made a claim against Mr. Werner's automobile liability insurance company and entered into a settlement in the amount of $12,500, with the understanding that she was preserving her right to proceed with an underinsured motorist claim for the excess value of her claim over the $15,000 policy limit. N.T., trial, p. 3.

(26) She then pursued a claim for underinsured motorist benefits against the plaintiff, Donegal Mutual Insurance Company, under an automobile insurance policy issued by the plaintiff to Mr. Levan and his wife, Natalie Levan, no. PAE 0515420, which the plaintiff denied on the basis that the defendant did not have permission from Enterprise to drive the replacement vehicle. N.T., trial, p. 3.

## DISCUSSION

Initially, the burden is upon the defendant to establish her entitlement to coverage under the terms of the insurance policy issued to Mr. and Mrs. Levan. The record is

clear that the replacement vehicle is covered[3] and that the defendant is an "insured" under the terms of the policy.[4]

Accordingly, the burden then shifts to the plaintiff to establish an exclusion under the terms of the policy that defeats the defendant's claim. In response, the plaintiff points to the following exclusion which appears in the underinsured motorists coverage section of the policy:

"(B) We do not provide underinsured motorists coverage for 'bodily injury' sustained by any 'insured': . . .

*"(3) Using a vehicle without the permission of the owner."* [5]

Therefore, the issue which we must determine is whether the defendant was driving the rental car without Enterprise's permission at the time of the collision. Under Pennsylvania law, the permission required to estab-

---

3. For purposes of the policy, a "covered automobile" is defined as including:

"(4) Any auto or 'trailer' you do not own while used as a temporary substitute for any other vehicle described in this definition which is out of normal use because of its:

"(a) Breakdown;

"(b) Repair;

"(c) Servicing;

"(d) Loss; or

"(e) Destruction."

4. The term "insured" is defined under the policy as:

" 'Insured' as used in this endorsement means:

"(1) You or any 'family member';

"(2) Any other person 'occupying' 'your covered auto.'

"(3) Any person for damages that person is entitled to recover because of 'bodily injury' to which this coverage applies sustained by a person described in (1) or (2) above."

5. All italicized language appearing in this opinion is for emphasis only.

lish coverage may either be express or implied. *Federal Kemper Insurance Co. v. Neary,* 366 Pa. Super. 135, 139, 530 A.2d 929, 931 (1987).

In the action at bar, it is clear that no such express permission was given by Enterprise, inasmuch as no additional drivers were permitted under the terms of the February 7, 1998 and February 10, 1998 rental agreements. Therefore, the only remaining issue is whether there is sufficient evidence as a matter of law to establish any implied permission on the part of Enterprise.

In the context of the use of a motor vehicle, implied permission may arise from the relationship of the parties or by virtue of a course of conduct in which the parties demonstrate their mutual acquiescence. *Federal Kemper, supra* at 139-40, 530 A.2d at 931. However, a finding of implied permission requires something more than mere tolerance without the taking of any steps to prevent the use of the motor vehicle. *Id.* at 140, 530 A.2d at 931. Instead, the owner of the vehicle must say or do something that warrants the belief that any subsequent use was with his consent. *Id.*

The defendant's first contention is that the record supports a finding of implied permission on the basis that the unidentified Enterprise employee was walking behind the defendant and Mr. Levan at the time that Mr. Levan gave her the keys to the replacement vehicle and that he was standing on the parking lot when the defendant drove away. We disagree, as there is no evidence in the record that this employee actually observed Mr. Levan hand the keys to the replacement vehicle to the defendant or observed her entering the driver's side of the replacement vehicle. On the contrary, the undisputed evi-

dence in the record is that they "split like a 'y,'" with Mr. Levan and the defendant walking to the left side of the parking lot toward the replacement vehicle and the unidentified Enterprise employee walking to the right side toward the returned rental vehicle and that, as the defendant drove away, the employee was standing next to the returned rental vehicle. N.T., trial, pp. 38-39.

Finally, the defendant maintains that the conduct of the unidentified Enterprise employee in allegedly waving to her and Mr. Levan as she drove away is evidence of implied permission on the part of Enterprise for her to operate the rental vehicle. Again, we must disagree. Under Pennsylvania law, the non-verbal conduct of a person is treated as a "statement," if it is intended as an assertion. See *Commonwealth v. Rush*, 529 Pa. 498, 605 A.2d 792 (1992); *Whelan v. W.C.A.B. (F. H. Sparks Co. of Pa. Inc.)*, 110 Pa. Commw. 242, 532 A.2d 65 (1987). Here, any alleged wave by the Enterprise employee toward the defendant and Mr. Levan is clearly non-verbal conduct intended as an assertion and, therefore, a statement. Therefore, inasmuch as it is being offered to prove the "truth of the matter asserted," that being implied permission from Enterprise for the defendant to drive the vehicle, it constitutes inadmissible hearsay.[6]

Accordingly, the record does not support a finding of implied permission by Enterprise for the defendant to drive the replacement vehicle.

---

6. Under Pa.R.E. 801(c), "hearsay" is defined as: "a statement other than one made by the declarant while testifying at the trial or hearing offered in evidence to prove the truth of the matter asserted."

## CONCLUSIONS OF LAW

(1) The defendant has met her burden of establishing that the replacement vehicle was covered under the terms of the automobile insurance policy issued by the plaintiff to David A. Levan and Natalie Levan, no. PAE 0515420.

(2) The defendant has met her burden of establishing that she is an "insured" under the terms of the automobile insurance policy issued by the plaintiff to David A. Levan and Natalie Levan, no. PAE 0515420.

(3) That policy contains an exclusion which prohibits an "insured" from the recovery of underinsured motorist benefits where she is using a vehicle without the permission of its owner.

(4) The defendant, as an "insured" under the terms of the policy, did not have express permission from Enterprise and Pennrac Inc., to drive the replacement vehicle on February 10, 1998.

(5) The defendant, as an "insured" under the terms of the policy, did not have implied permission from Enterprise and Pennrac Inc., to drive the replacement vehicle on February 10, 1998.

Accordingly, the plaintiff has met its burden of establishing that the defendant is not entitled to recover underinsured motorist benefits under the aforesaid insurance policy, thereby requiring the entry of the following verdict.[7]

---

7. The defendant is also asking this court to reconsider a ruling made by Judge Scott E. Lash, a judge of coordinate jurisdiction in the Court of Common Pleas of Berks County, in his order dated March 18, 2003, denying the parties' cross-motions for summary judgment, that:

## VERDICT

And now, June 22, 2004, this court finds in favor of the plaintiff, Donegal Mutual Insurance Company, and against the defendant, Lisa Cipolla.

---

"(3) Plaintiff, Donegal Mutual Insurance Company, in making payment of defendant, Lisa Cipolla's, first-party benefits, did not admit coverage nor waive any objection to coverage for underinsured motorists benefits."

Her request is based upon *Wood v. Allstate Insurance Co.,* 1997 WL 602796 (E.D. Pa. 1997), and, more recently, *Hollock v. Erie Insurance Exchange,* 842 A.2d 409 (Pa. Super. 2004). In particular, the defendant relies upon *Wood* for the proposition that Judge Lash's ruling was clearly erroneous and upon *Hollock* on the basis that *Hollock* represents a change in the applicable law and had not been decided at the time that Judge Lash made his ruling. However, we decline to do so on the basis that we do not believe that either case supports the defendant's arguments.