**Davis v. Fidelity National Insurance Company**

180

*Carl J. Gugliardo*, for plaintiffs
*Lawrence A. Durkin*, for defendant

MINORA, *J.*, August, 15, 2013—

## I. INTRODUCTION AND PROCEDURAL POSTURE

Before the court is an insurance bad faith and breach of contract action arising out of a title insurance policy that was issued by defendant, Fidelity National Insurance Company, to plaintiffs, Richard and Maria Davis, on October 29, 2004. The insurance policy insured a parcel of property upon which plaintiffs proposed to build a residential development consisting of twelve townhouses comprised of three, four-unit townhouse buildings and 32 single family homes. The townhouses were to be built on a 1.86 acre triangular portion of the property. It was the ownership of this 1.86 acre piece of property that came into dispute and for which the title insurance claim was made.

The parties proceeded to a bench trial before this court on January 29, 30 and 31, 2013. Both parties waived their right to a jury trial on the contract action and agreed that this court would serve as the fact-finder for both the bad faith and contract counts. The factual findings set forth below have been established by clear and convincing evidence and are based upon the testimony and evidence, which this court has found to be competent, credible, relevant and admissible in this case.

## II. GENERAL FINDINGS OF FACT

(1) The defendant, through its authorized agent, Daniel Penetar, Esq., issued a title insurance policy to plaintiffs on October 29, 2004. *Stip. Fact 1.*

(2) The policy insured an approximate 15 acre parcel of land in Carbondale Twp., Lackawanna County, Pennsylvania. *Stip. Fact 2.*

(3) Daniel L. Penetar, Jr., Esquire, counter-signed the policy as the authorized agent of defendant and also served as counsel for plaintiffs with respect to the subject purchase of land. *Stip. Fact 4.*

(4) Plaintiffs planned to develop the 15 acre parcel of land for residential housing, in the nature of both one-half acre parcels for individual homes and a "garden section" containing three, four-unit townhouses all of which would be offered for sale to the public. *Stip. Fact 3.*

(5) The "garden section" containing the townhouses was to be developed on a 1.86 acre portion of the property. *Stip. Fact 5.*

(6) Prior to 2007, Mr. Davis purchased non-sealed

construction plans for the townhouses and hired an engineering firm to draft plans and drawings for the subdivision of the development. *Stip. Fact 6; Pltf. Exh. 25 — "HICKORY PLANS."*

(7) The size of each of the twelve townhouses was to be approximately 1,100 square feet, not including an indoor, single-car garage. *N.T. Vol. I, p. 37-38.*

(8) In 2007, plaintiff, Rick Davis, attended a Carbondale Twp. Zoning board meeting to request a zoning special exception that would accommodate the townhouse development. *Stip. Fact 7.*

(9) At the zoning hearing, a neighboring property owner, Louis Norella, objected on the basis that he was the proper owner of record of the 1.86 acre parcel. *Stip. Fact. 8.*

(10) At that time, the zoning board could not approve plaintiff's request until it was determined who actually owned the disputed portion of the land. *N.T. Vol. I, p.42.*

(11) On October 15, 2007, Mr. Davis filed a title insurance claim with defendant as related to a possible defect in the title to the 1.86 acre parcel of land. *Stip. Fact 9.*

(12) Receipt of Mr. Davis' claim was acknowledged by defendant by letter dated October 24, 2007. *Pltf. Exh. 2, doc. No. 336.*

(13) On November 8, 2007 defendant's title agent, Daniel Penetar, Esquire, notified defendant that although he did perform a title search prior to issuing the Davis title policy, he did not include a search of the Norella chain

of title. Once the dispute was brought to his attention he searched the Norella deed and it did appear to include the disputed piece of property. *Pltf. Exh. 2, doc. No. 251.*

(14) By letter dated December 13, 2007, defendant notified Mr. Davis that it was in the process of evaluating his claim and hoped to get back to him "shortly." *Pltf. Exh. 2, doc. No. 334.*

(15) On December 10, 2008, Attorney Penetar again wrote to defendant and explained that he and the surveyor the defendant hired concluded that the disputed area is, and always has been, included in the Norella title. The same letter explained that the Davis' source of title traced back to a 1963 quiet title action, which was defective due to lack of proper service upon the rightful land owner. *Pltf. Exh. 2, doc. No. 253-254.*

(16) On January 10, 2009, defendant claims representative, Joseph Rejent, noted that the surveyor concluded that the insured did not own all the land he thought he owned and that one of the parcels purchased by the insured "came out of a Quiet Title Action which now appears to be faulty." *Pltf. Exh. 2, doc. No. 011.*

(17) On June 18, 2009, defendant completed its coverage investigation of the Davis claim. Defendant notified plaintiff that there were no relevant policy exceptions or exclusions; that it was accepting the Davis claim; and that they would contact Mr. Davis shortly about resolution of the claim. *N.T. Vol. I, p. 45 and Pltf. Exh. 2, doc. No. 265.*

(18) On September 15, 2009, defendant hired Michael Coughlin, Esquire to evaluate the merits of filing a quiet title Action. *Discovery docs. 297-298; 220-221; 300; and*

*280-281.*

(19) On January 20, 2010, defendant obtained a legal research memo related to its options to resolve the claim as well as the merits of a quiet title action. *Stip. Fact 13.*

(20) From March 2010 through October 2010, Mr. Davis repeatedly inquired into the status of his claim, however he did not receive a response from defendant. *N.T. Vol. I, p. 51-56.*

(21) Defendant obtained DIV appraisals on March 20, 2010. *Defendant DIV appraisals.*

(22) In July 2010, the defendant attempted to "negotiate a settlement" with the neighbor for the purchase of the 1.86 acres. *Stip. Fact 15.*

(23) Regarding the option to file a quiet title action to resolve the claim, defendant knew (and documented on April 28, 2010) that such an action would likely be defeated if defended because there existed a notice/service defect in an earlier 1963 quiet title action for the subject property. *Stip. Fact 16.*

(24) On August 27, 2010 defendant's retained counsel, Michael Coughlin, Esquire, wrote the following to defendant claims attorney Benjamin Bartek:

> "Ben, any word on this? The insured called me once again to find out how we intend to proceed. This claim has been hanging around for an extremely long time and I am concerned that the insured may opt to sue us for bad faith if we don't take some action relatively soon."

*Stip. Fact 18.*

(25) Mr. Davis hired David J. Tomaine, Esquire, and instructed Mr. Tomaine to give defendant a deadline for resolution of the claim. *N.T. Vol. I., p. 57.*

(26) On November 22, 2010, Mr. Tomaine called defendant's retained counsel, Mr. Coughlin, to discuss status of the Davis claim. *Stip. Fact 22.*

(27) Mr. Coughlin had contact with defendant's "operations" attorney, Keith Weller, on December 9, 2010. *Stip. Fact 23.*

(28) The present suit was commenced on December 14, 2010. *Stip. Fact 20.*

(29) On December 13, 2010, the defendant placed the first payment authority for settlement or resolution of this claim. *Stip. Fact 19.*

(30) Mr. Weller contacted Raymond Abrams of defendant's Omaha, Nebraska claims center on or about December 13, 2010. *Stip. Fact 24.*

(31) Mr. Abrams testified that the litigation that was attempting to be avoided was the quiet title action against Mr. Norella. *Stip. Fact 25.*

(32) On December 13, 2010 Mr. Abrams granted $25,000 settlement authority on this claim without a case assessment report (CAR) having been done. *Stip. Fact 26.*

(33) Generally, though not always, a CAR is required to be done before settlement authority may be placed on a file. *Stip. Fact 27.*

(34) Prior to December 13, 2010, no amount of settlement authority had been placed on the Davis claim.

*Stip. Fact 28.*

(35) Defendant's claims manual provides the following:

"Insurer's Response to Tender of Claim; Investigation…"

"Response by the insurer to the claimant should be *timely*. The claims administrator should *follow the requirements of the applicable statutes and regulations regarding acknowledgment of receipt of an insured's claim; completion of investigation; and notification of the title company's decision regarding coverage.* Some state regulatory schemes provide specific timelines, while others simply require that the insurer's response occur in a *reasonable time.*"

*Stip. Fact 29.*

(36) Defendant's first written settlement offer to Mr. Norella (the property owner of record) was made on December 14, 2010. *Dec. 14, 2010 letter from M. Coughlin to L. Norella.*

(37) On December 14, 2010, plaintiff commenced the subject breach of contract and bad faith lawsuit. *N.T. Vol. I, p. 59 and Complaint.*

(38) On January 6, 2011, defendant tendered payment to plaintiffs in an amount equal to the $20,000 DIV; however, plaintiffs did not accept the payment as this suit had already been filed. *Pltf. Exh. 5; D.T. 59:12 to 59:21.*

(39) Plaintiffs' claim was resolved with defendant agreeing to pay the owner of the disputed property $50,000.00 (fifty thousand dollars) and transfer title in plaintiffs' names in August 2012. *N.T. Vol. I, p. 64-65.* Defendant also hired counsel to effectuate a subdivision

approval of the property and a surveyor to prepare the necessary plans. *R.T. 153:21 to 154:1; D.T. 64:18 to 65:3; testimony of George Broseman ("G.T.") 102:7 to 102:18; 106:6 to 106:14.*

(40) On November 7, 2012, the Carbondale Twp. Zoning Board granted plaintiffs' request for special exception, in accordance with Carbondale Twp. zoning law, to construct three, four-unit townhouses on the parcel of property that is the basis of this lawsuit. *Stip. Fact 35.*

(41) No appeal of the November 7, 2012 special exception has been filed. *Stip. Fact 36.*

(42) Defendant's title insurance policy provides that claims are resolved either by paying, or otherwise settling with, other parties for or in the name of an insured claimant, or by paying the loss to, or otherwise settling with, the insured claimant. *Policy, Pltf. Exh. 1, ¶6.*

(43) Pursuant to the policy, defendant therefore had the option to (a) attempt to cure the title defect by filing a quiet title action, or negotiate with the Norellas to convey the 1.86 acre disputed parcel to the plaintiffs, or (b) pay the loss as defined by the policy, which is the lesser of the policy limits or the diminution in value (DIV) of the property as a result of the title defect. *Policy, Pltf. Exh. 1, ¶6.*

(44) Under the policy, "The liability of the Company shall not exceed the least of: (i) The Amount of Insurance stated in Schedule A; or, (ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by [the Policy]."

*Policy, Pltf. Exh. 1, ¶7(a).*

## III. GENERAL CONCLUSIONS OF LAW

### (A) LIABILITY

(1) In the present case, there were several known legal duties and fiduciary obligations recklessly disregarded by Fidelity, namely unreasonable delay in adjusting and resolving the claim, repeated violations of the Unfair Insurance Practices Act and Unfair Claims Practices Act, failure to adequately train and supervise its employees, failure to follow its own claims handling guidelines, failure to make a timely offer of settlement, and elevating its own interest above the interest of its insured, among other duties.

(2) As defined by Black's Law Dictionary, bad faith occurs through an insurance company's unfounded (though not necessarily fraudulent) refusal to provide coverage in violation of the duties of good faith and fair dealing owed to an insured. *Terletsky v. Prudential Property and Cas. Ins. Co.*, 437 Pa. Super. 108, 124, 649 A.2d 680, 688 (1994); *Black's Law Dictionary (9th ed. 2009)*.

(3) In a typical §8371 bad faith action against an insurer, plaintiffs must be able to demonstrate both elements of a two-part test by "clear and convincing" evidence. The test is: (1) the insurer lacked a reasonable basis for denying coverage; and (2) the insurer knew or recklessly disregarded its lack of a reasonable basis. *Adamski*, 738 A.2d at 1036.

(4) It is this court's conclusion of law that the defendant, insurer, acted in bad faith and its conduct embodies reckless disregard toward its insured from the time the

claim was filed on October 15, 2007 until the time that the claim was finally resolved in August of 2012.

(5) It is the further conclusion of law of this court that punitive damages are appropriate given the reckless disregard to the rights of the plaintiffs, its own first party insured, by defendant Fidelity.

(6) Section 8371 of the Judicial Code governs bad faith actions against an insurer by its insured, and provides:

"In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

"(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3 percent."

"(2) Award punitive damages against the insurer."

"(3) Assess court costs and attorneys' fees against the insurer."

42 Pa. C.S. §8371.

(7) The bad faith statute "authorizes courts, which find that an insurer has acted in bad faith toward its insured, to award punitive damages, attorneys' fees, interest and costs." *Birth Center v. St. Paul Companies Inc.*, 567 Pa. 386, 403, 787 A.2d 376, 386 (2001).

(8) Section 8371 does not define what conduct constitutes bad faith and the appellate courts have cautioned that "the breach of the obligation to act in good faith cannot be precisely defined in all circumstances."

*Zimmerman v. Harleysville Mutual Insurance Co.*, 860 A.2d 167 (Pa. Super. 2004).

(9) Rather, bad faith claims "are fact-specific and depend on the conduct of the insurer vis-i-vis its insured." *Williams v. Nationwide Mutual Insurance Co.*, 750 A.2d 881, 887 (Pa. Super. 2000).

(10) Decisional precedent has described bad faith conduct by an insurer as including "any frivolous or unfounded refusal to pay proceeds of a policy." *Bonenberger v. Nationwide Mutual Insurance Co.*, 791 A.2d 378, 380 (Pa. Super. 2002); *Adamski v. Allstate Insurance Co.*, 738 A.2d 1033, 1036 (Pa. Super. 1999), *appeal denied*, 563 Pa. 655, 759 A.2d 381 (2000); *Williams, supra.*

(11) Since the insurer's conduct in failing to pay a claim must import a dishonest purpose in order to be deemed bad faith, the insured is required to prove that the insurer breached its duty of good faith and fair dealing through some motive of self-interest or ill will. *Brown v. Progressive Insurance Co.*, 2004 WL 2002477, *7, ¶34 (Pa. Super. 2004); *O'Donnell v. Allstate Insurance Co.*, 734 A.2d 901, 905 (Pa. Super. 1999).

(12) Although mere negligence or bad judgment is insufficient to establish bad faith, it is not necessary for the insurer's refusal to be fraudulent. *Bonenberger, supra*; *Adamski, supra*. For that reason, "bad faith encompasses a wide variety of objectionable conduct." *Brown, supra* at *6, ¶31.

(13) By way of illustration, actions by the insurer which are violations of the Unfair Insurance Practices Act are considered to be bad faith conduct under Section 8371.

*O'Donnell*, 734 A.2d at 906. Therefore, an insurer may be liable for bad faith if it fails to conduct a good faith investigation and neglects to communicate promptly with the insured. *Brown, supra* at *6, ¶31 (quoting *Romano v. Nationwide Mutual Fire Insurance Co.*, 435 Pa. Super. 545, 553-54, 646 A.2d 1228, 1232 (1994)).

(14) As the Superior Court of Pennsylvania has remarked:

> "Individuals expect that their insurers will treat them fairly and properly evaluate any claim they may make. A claim must be evaluated on its merits alone, by examining the particular situation and the injury for which recovery is sought. An insurance company may not look to its own economic considerations, seek to limit its potential liability, and operate in a fashion designed to 'send a message.' Rather, it has a duty to compensate its insureds for the fair value of their injuries. Individuals make payments to insurance carriers to be insured in the event coverage is needed. It is the responsibility of insurers to treat their insureds fairly and provide just compensation for covered claims based on the actual damages suffered. Insurers do a terrible disservice to their insureds when they fail to evaluate each individual case in terms of the situation presented and the individual affected."

*Bonenberger*, 791 A.2d at 382.

(15) When considering the merits of a bad faith claim, "one must look at the behavior of the insurer toward the insured and measure its reasonableness… to see whether it is perhaps more than mere negligence or bad judgment…." *Ash v. Continental Insurance Co.*, 593 Pa. 523, 932 A.2d

877 (2007).

(16) With respect to the present case, the evidence clearly shows that Fidelity did not have a reasonable basis for taking almost five (5) years to resolve plaintiffs' claim. At virtually every stage of defendant's claims review and adjustment there is a disturbing pattern of chronic delay. *See, Findings of Fact*, ¶11-38.

(17) Defendant recognizes and readily acknowledges that it should have resolved plaintiffs' title insurance claim more quickly. However, defendant argues that its delay does not give rise to a claim for bad faith liability under 42 Pa. C.S. §8371 because plaintiffs presented no evidence of any ill will, improper motive, or dishonest purpose as the cause of the delay. Defendant instead asserts that its actions merely amount to simple neglect of the claim and bad judgment, which they claim is not enough to trigger liability under §8371.

(18) An insurer can, in good faith, delay payment based upon information that it does not yet have. It is only if the delay was due to an evil motive or a reckless indifference to the rights of the insured that bad faith can be present. *Younis Bros. & Co., Inc. v. Cigna Worldwide Ins. Co.*, 882 F. Supp. 1468, 1470 (E.D. Pa. 1994).

(19) However, the present title insurance case is factually unique because Fidelity did not deny coverage. Instead, Fidelity took 20 months to complete its investigation and notify plaintiffs that the claim was covered under their policy. *See, Findings of Fact*, ¶11, 13. Defendant then delayed payment for almost three years, only finally tendering an inadequate offer once suit was filed. *See, Findings of Fact*, ¶18, 30.

194

(20) This court concludes that such an extreme delay can certainly constitute bad faith under 42 Pa. C.S. §8371.

(21) Fidelity knew of and consciously disregarded its lack of a reasonable basis for failing to resolve the Davis' claim during the nearly five (5) year period in question. Such conscious disregard can be seen though Fidelity's repeated failure to respond to Davis' constant inquiries regarding the status of his claim. This conscious disregard is also illustrated in the correspondence between the defendant claims attorney, Shawn Grimsley, Esq., and the claims manager, Malachay Sullivan, on September 2, 2009, in which Mr. Grimsley conveyed his concerns regarding the extreme and unnecessary delay involved with the handling of the Davis' claim as well as the possibility that the insured "may opt to sue us for bad faith if we don't take some action relatively soon." *Pltf. Exh. 2, doc. No. 297-298; Pltf. Exh. 2, doc. No. 053*. This communication marks the earliest definitive date when defendant knew that it had no reasonable basis to continue to deny, by delay, the resolution of plaintiffs' claim.

(22) Fidelity also displayed improper purpose in its delay such as ill will, improper motive, dishonesty or self-interest through its dealings with adjoining property owner Mr. Norella by knowingly threatening a meritless quiet title suit, and investigating his finances to determine whether he could afford to defend the quiet title action instead of settling the claim and making the insured whole. *Pltf. Exh. 14, Bartek dep. P. 43, In 10-18.*

(23) A lengthy delay in payment owed by an insurer does not automatically constitute bad faith, since the delay could be due to negligence. *El Bor Corp. v. Fireman's*

*Fund Ins. Co.*, 787 F. Supp. 2d 341, 349 (E.D. Pa. 2011). In *El Bor Corp. v. Fireman's Fund Ins. Co.*, delay in the processing of the claim, because the claim had "fallen through the cracks," did not constitute bad faith because the delay was not knowing or reckless, only negligent. Therefore, a seven-month delay in the processing of the insured's claim after receipt of the expert report did not constitute bad faith. *Id.*

(24) The length of Fidelity's delay in the present case greatly exceeds the seven-month delay in *El Bor Corp. v. Fireman's Fund Ins. Co.* Further, Fidelity was repeatedly reminded by Davis' numerous inquiries that his claim continued to remain outstanding and unresolved.

(25) There is sufficient credible evidence showing that the insurer's scheme and conscious disregard in turning a blind eye to Davis' claim hoping that it would somehow resolve itself backfired. Fidelity's self-serving, self-created position in retaining policy proceeds rightfully belonging to their insured, our plaintiff, presents a gross and reckless indifference to the rights of the insured with whom they had a contractual relationship and arguably, a fiduciary relationship as well. *Hollock v. Erie Ins. Exchange*, 54 Pa. D & C. 4th 449, 518 (Pa. Com. Pl. 2002). Fidelity's delay was not only due to negligence, but also because of reckless disregard of the plaintiffs' rights, through its repeated attempts over nearly five years to find a cheaper way of escaping their liability to settle settling the claim, while the Davis' waited and watched their proposed subdivision languish.

(B) COMPENSATORY DAMAGES TO INSURED

(1) "Consequential damages are generally understood

to be other damages which naturally and proximately flow from the breach and include three types of lost profit damages: (1) lost primary profits; (2) lost secondary profits; and (3) loss of prospective profits, also commonly referred to as good will damages." *AM/PM Franchise Association v. Atlantic Richfield Co.*, 536 Pa. 110, 119, 584 A.2d 915 (Pa. 1990).

(2) However, statutorily, plaintiffs cannot recover under 42 Pa. C.S. §8371 for any compensatory or consequential damages. *Birth Center*, 787 A.2d at 403. Courts applying §8371 have uniformly held that a successful plaintiff may only recover the damages that are expressly provided by the statute: interest, court costs, punitive damages, and attorney's fees. *Id.* at 402-403.

(3) Compensatory damages may be awarded under Pennsylvania common law, which has historically recognized the implied covenant of good faith and fair dealing in the context of insurance law. *Zaloga v. Provident Life and Acc. Inc. Co. Of America*, 671 F. Supp. 2d 623, 630 (M.D. Pa. 2009).

(4) The general rule is that consequential damages are recoverable in contract and tort actions where (1) there is evidence to establish them with reasonable certainty; (2) there is evidence to show that they were the proximate consequence of the wrong; and (3) in contract actions, they were reasonably foreseeable. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa. Super. 90, 464 A.2d 1243, 1257 (1983).

(5) Plaintiffs' claims for compensatory damages are not limited solely to statutory bad faith claims under section 8371. They also include a bad faith claim arising from

defendant's breach of the implied covenant of good faith and fair dealing, and therefore their claim for compensatory damages is proper. *Zaloga v. Provident Life and Acc. Inc. Co. of America*, at 631.

(6) To prevail on a breach of contract cause of action under Pennsylvania law, a plaintiff has the burden of showing the following: the existence of a contract, including its essential terms; a breach of a duty imposed by the contract; and damages to the plaintiff as a result of the breach. *Core-States Bank v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999).

(7) Pennsylvania law implies a duty of good faith into an insurance contract and the breach of such a duty constitutes a breach of the insurance contract. *Berg v. Nationwide*, 2012 Pa. Super. 88, 44 A.3d 1164, 1170 (2012), citing *Gray v. Nationwide*, 422 Pa. 500, 508, 223 A.2d 8, 11 (1966).

(8) Here, the plaintiffs assert that the defendant breached the title insurance contract entered into between the parties in at least three respects: (1) In failing to fulfill its contractual obligations in a reasonably diligent manner due to taking almost five years to resolve the claim; (2) By failing to pay the loss within 30 days of fixing the amount thereof, as required by the terms of the contract (Pltf. Exh. 1, ¶12(a)); and, (3) By breaching their implied duty of good faith and faith dealing with its insureds, by, among other things: delaying resolution of the claim for nearly five years; repeatedly failing to communicate with its insureds about the claim, despite repeated requests for information; and by committing multiple violations of the Pennsylvania Unfair Insurance Practices Act and Unfair

Claims Settlement Practices Regulations.

(9) In addition to violation of Pennsylvania's bad faith statute, 42 Pa. C.S. §8371, this court finds clear and convincing evidence of bad faith conduct by defendant in the following:

(10) Through defendant's failure to make a timely offer of settlement. *Hollock v. Erie Ins. Exchange*, 54 Pa. D. &C.4th (Luzerne 2002), *aff'd* 842 A.2d 409 (Pa. Super. 2004) (the court held that bad faith conduct by an insurer may include the failure to make a reasonable offer of settlement). *See also, Klinger v. State Farm*, 115 F.3d 230 (3d. Cir. 1997).

(11) Through defendant's failure to manage and supervise the handling of the Davis claim. An insurer's failure to "efficiently, effectively, and professionally manage" its insured's claim may serve as a basis for bad faith. *See, Liberty Mutual Ins. Co. v. Paper Manufacturing Co.*, 753 F. Supp. 156, 159-160 (E.D. Pa. 1990) and *Adamski, supra.*

(12) Through defendant's elevating its own interest above that of its insured. An insurer must give the interests of its insured the same faithful consideration that it gives its own interests. *Hollock, supra.*

(13) Through the defendant's failure to follow its own internal claims handling guidelines (the failure of an insurance company to follow its own internal claims handling guidelines may be evidence of not having a reasonable basis for denying insurance benefits). *Galko v. Harleysville Penn Land Insurance Co.*, 2005 Pa. D. &C.4th 236 (Lacka. 2005).

(14) It has also been held that an insurer can be held liable for bad faith where the insurer's assessment of a claim is "less than honest, intelligent and objective." *Puritan Ins. Co. v. Canadian Ins. Co.*, 775 F.2d 76 (3d Cir. 1985).

(15) We must also look to the *Hollock* trial court's rendition of what constitutes bad faith where it adopts the guidelines set forth in the Unfair Insurance Practices Act, 40 P.S. §1171 et seq. and the Pennsylvania Code regulations for insurance practices, 31 Pa. Code §146.1 et seq. Those segments that we find most applicable are set forth below:

(16) Defendant violated 31 Pa. Code 146.6 — Standards for prompt investigation of claims, which requires an insurer to complete its investigation of a claim within 30 days after notification of claim, unless the investigation cannot reasonably be completed within the time. If the investigation cannot be completed within 30 days, and every 45 days thereafter, the insurer shall provide the claimant with a reasonable written explanation for the delay and state when a decision on the claim may be expected. Here defendant took 20 months to complete its investigation, without the legally required communication and justification for such a delay. Despite plaintiffs' constant efforts, defendant did not communicate any explanation for the delay to its insured.

(17) Defendant repeatedly violated 40 P.S. 1171.5(a)(10) (ii) (failing to acknowledge and act promptly upon written or oral communication with respect to claims arising under insurance policies), and 31 Pa. Code §146.5(c) (Failure to acknowledge pertinent communications, requiring that

that an appropriate rely shall be made within 10 working days on other pertinent communications from a claimant which reasonably suggest that a response is expected). Here defendant routinely ignored plaintiffs, who initiated repeated communications, with his insurer over a period of years.

(18) Defendant violated 40 P.S. 1171.5(a)(10)(v) — Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed and communicated to the company or its representative. In support of this conclusion the court adopts, by reference thereto, those conclusions of law related to defendant's unreasonable basis to delay/deny plaintiffs' claim, *supra*, as it fully set forth herein at length. *See, findings of fact*, 20, 24, 27, 37, etc.

(19) Defendant violated 40 P.S. 1171.5(a)(10)(vi) — "Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear." In the present case, the testimony established that defendant's liability under the policy was clear within months of the claim being filed. However, at no time prior to this lawsuit being filed on December 14, 2010, was a settlement offer made to Mr. Norella, the true owner of the land, or to the insureds, Mr. and Mrs. Davis.

(20) The unreasonable delay of nearly five years, along with multiple, and often repeated, violations of Pennsylvania law by defendant leads the court to conclude that the defendant's conduct extended well beyond mere negligence or misjudgment and instead demonstrated bad faith and reckless indifference towards its insureds. This

is especially so when it is noted as above, that it took the filing of this lawsuit to finally motivate defendant to authorize monetary authority on this claim and to resolve the dispute.

(21) The plaintiffs have provided estimates for the increased costs of construction between 2007 and 2013, and the depreciation in market value of the townhouses. These numbers amount to $89,760.00 and $272,400.00 respectively. *N.T. Vol. I, p. 163; N. T. vol. I, p. 232, 239-240 and Pltf. Exh. 39.*

(22) However, the court finds that the futuristic appraisal numbers lack credibility and are therefore unpersuasive. The timeline for construction and the rollout and readiness of the units for market are not based upon any fixed construction schedule, nor is their completion and entry into the marketplace clearly determined. We therefore exercise our discretion as fact finder and allow $135, 000.00 for depreciation as well as $89,760.00 for plaintiffs' increased construction costs.

## (C) PUNITIVE DAMAGES

(1) Pennsylvania courts have established that a finding of bad faith against an insurer toward its insured was the only statutory prerequisite to punitive damages award in an action arising under an insurance policy pursuant to 42 Pa. C.S.A. §8371. *Hollock, supra* at 418.

(2) It is well recognized that a determination of bad faith does not necessitate an award of punitive damages, but it does allow for an award of punitive damages without additional proof, subject to the trial court's exercise of discretion. *Id.*, at 419.

(3) For the reasons set forth above, we find that Fidelity's bad faith conduct was clearly proven to be outrageous and egregious and displayed a reckless disregard toward the right and interests of the Davis'. Therefore, the Davis' are entitled to an award of punitive damages under 42 Pa. C.S. §8371 (a). *Adamski, supra.*

(4) The Pennsylvania Superior Court concluded "the size of a punitive damages award must be reasonably related to the state's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or exceeding a single-digit ratio will satisfy due process." *Id.* at 425; *Hollock, supra* at 421.

(11) In analyzing the proportionality between the compensatory damages and the punitive damages, the amount of counsel fees and costs awarded is to be included in the compensatory damages figure. *Id.* at 421-422. Therefore, the total compensatory damages figure for the purpose of calculating punitive damages is:

$89,760.00 — Increased Construction Costs

$135,000.00 — Depreciation

$158,450.00 — Attorney's Fees

$10,017.31 — Litigation Costs and Expenses

Total Compensatory Damages: $393,227.31

(12) Given Fidelity's net worth (averaging $454,557,975.67 from 2009 through 2011, based on stipulation of the parties), a significant punitive damage award is necessary in order to deter Fidelity from engaging in similar misconduct towards other policy holders.

(13) The significant harm caused to Plaintiffs in essentially stopping their business investment and development for years while Fidelity refused to act must also be considered in calculating punitive damages.

(14) Taking all of the above factors into consideration we find that an appropriate multiplier is an award of four times the compensatory damages as rendered by this court as $393,227.31. The total punitive damages award equals $1,572,909.24. unfettered discretion." *Shiner v. Moriarty*, 706 A.2d 1128, 1241 (Pa. Super. 1998).

(5) Punitive damages are directed towards deterrence and retribution. *State Farm v. Campbell*, 538 U.S. 408, 419 (2003).

(6) In assessing punitive damages, the trier of fact should consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause, and the wealth of the defendant. *SHV Coal Inc. v. Continental Grain Co.*, 526 Pa. 489, 493-94, 587 A.2d 702, 704 (1991).

(7) A defendant's net worth has been recognized "as a valid measure of its wealth" for purposes of punitive damages. *See Sprague v. Walter*, 441 Pa. Super. 1, 61-63, 656 A.2d 890, 920 (1995).

(8) Davis and Fidelity have stipulated through the admission of plaintiff exhibits 20, 21 and 22, that the defendant's net worth between 2009 and 2011 ranged between $363, 555, 922.00 and $528,567,433.00.

(9) However, the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments, and mandates that the proportionality between the actual

or potential harm suffered and the size of the punitive damages award is relevant. *State Farm v. Campbell*, at 424-426.

(10) Although there is no "bright-line" test that a court can apply to ensure that the size of an award of punitive damages complies with due process, several factors are called into question, the Supreme Court has noted that "in practice, few awards

(15) This approach is significant in terms of the insurer's wealth while it accounts for defendant's continuing financial stability and will not destroy its operations. Such an amount operates as a deterrent to the defendant, as well as other insurers in the future. *Shiner, supra.*

(D) INTEREST

(1) A separate issue the court is called to confront is the subject matter of interest as applied to compensatory damages as applicable under 42 Pa. C.S.A. §8371.

(2) 42 Pa. C.S.A. §8371 prescribes that upon a finding of bad faith, by an insurer, a court may award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(3) The statute plainly states that interest should be applied to the amount of the claim from the date the claim was made. *See* 42 Pa. C.S.A. §8371(1).

(4) The date we shall assess as the date the claim was made is October 15, 2007 (*See, Findings of Fact* ¶11). This date marks the day that Richard and Maria Davis had a legitimate claim arising from their insurance policy.

Therefore, we shall apply 3 percent above the prime rate of interest to the verdict in the underlying action payable by Fidelity National Insurance Company pursuant to 42 Pa. C.S.A. §8371(1).

(5) Pa. R.C.P. 238 lists the prime rates of interest for each year as set forth in the first edition of the *Wall Street Journal* for the purposes of damages. Under Pa. R.C.P. 238, the prime rate of interest for the applicable years was 8.25 percent for 2007, 7.25 percent for 2008, and 3.25 percent for 2009 through 2013.

(6) Therefore, calculating this interest rate plus 3 percent, the amount of interest due is to equal $92,735.12, which represents the period of October 15, 2007 through August 15, 2013.

| 2007 | 10 Weeks at 11.25 percent | $4,862.60 |
|------|---------------------------|-----------|
| 2008 | 52 Weeks at 10.25 percent | $23,037.90 |
| 2009 | 52 Weeks at 6.25 percent | $14,047.50 |
| 2010 | 52 Weeks at 6.25 percent | $14,047.50 |
| 2011 | 52 Weeks at 6.25 percent | $14,047.50 |
| 2012 | 52 Weeks at 6.25 percent | $14,047.50 |
| 2013 | 32 Weeks at 6.25 percent | $8,644.62 |

(E) ATTORNEY'S FEES

(1) Pa. C.S. §8371 provides for the recovery of counsel fees and expenses "to compensate the plaintiff for having to pay an attorney to get that to which they were contractually entitled" and punitive damages "to punish the defendant for its bad faith in failing to do that which it was contractually obligated to do." *Klinger, supra* at 236.

(2) In the present case, attorney's fees and costs were

admitted through stipulation of the parties in plaintiffs' exhibit 17 and plaintiffs' exhibit 18 respectively. *N.T. January 31, 2013, p. 97.*

(3) Plaintiffs' exhibit 17 indicates that the reasonable value of said legal services is $158,450.00. *pltf. exh. 17.*

(4) This amount includes 633.8 service hours at $250.00 an hour. *Id.* The court finds the amount of these legal fees to be reasonable and customary for our area.

(5) Plaintiffs' exhibit 18 indicates that plaintiffs' litigation costs and expenses from trial through the beginning of trial totaled $7, 392.31 and that plaintiffs' litigation cost and expenses from trial through the current date totaled an additional $2,625. Therefore plaintiffs' total litigation costs and expenses are $10,017.31. As they are well documented the court accepts these costs and expenses as offered.

(6) This court therefore finds the amount assessed for both attorney's fees to be a reasonable and acceptable fee, and the amount measured for litigation costs and expenses to be reasonable and acceptable.

(7) Therefore, our assessment of attorney's fees and cost will include an award to Richard Davis and Maria Davis in the amount of $168,467.31.

An appropriate order follows.

### ORDER

And now, this 15th day of August 2013, upon consideration of the parties' verbal and written arguments of counsel and all testimony and evidence presented to the court on January 29, 30 and 31, 2013 and in accordance

with the preceding memorandum it is hereby ordered and decreed as follows:

(1) A verdict is entered in favor of the plaintiffs, Richard Davis and Maria Davis, and against the defendant, Fidelity National Insurance Co., pursuant to 42 Pa. C.S. §8371 based upon clear and convincing evidence that the defendant, Fidelity National Insurance Co., acted in bad faith toward its insureds, Richard Davis and Maria Davis, and pursuant to plaintiffs' bad faith claim based upon clear and convincing evidence that defendant breached its implied covenant of good faith and fair dealing towards the insured.

(2) The court finds that the defendant, Fidelity National Insurance Company is liable for the entire amount of the verdict rendered, totaling $1,966,136.55, in the underlying action, plus interest at the rate of 3 percent above the prime rate of interest from the date of October 15, 2007, the claim was made through August 15, 2013 equal to $92,735.12.

(3) The court awards punitive damages against the defendant, Fidelity National Insurance Company, in an amount of four times the compensatory damages awarded by this court equaling $1,572,909.24.

(4) The court awards compensatory damages to the insured, Richard Davis and Maria Davis, in the amount of $224,760.00.

(5) The court awards attorney's fees and costs to Richard Davis and Maria Davis in the amount of $168,467.31.

$92,735.12 simple interest 10/15/07 — 8/15/13

$1,572,909.24 punitive award (4 x compensatory damages verdict)

$224,760.00 compensatory damages

$168,467.31 Davis' attorney's fees and costs

$2,058,871.67 Total verdict

> (6) Judgment is entered in the amount of $2,058,871.67 for the plaintiffs.