J-A14037-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ALAN KAPLAN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WEINSTEIN APPRAISAL GROUP, | : | |
| INC., T/D/B/A WEINSTEIN REALTY | : | |
| ADVISORS AND WEINSTEIN | : | No. 1009 MDA 2021 |
| APPRAISAL GROUP | : | |
| | : | |
| Appellant | : | |

Appeal from the Judgment Entered July 27, 2021
In the Court of Common Pleas of Schuylkill County Civil Division at
No(s): S-1301-2007

BEFORE:   BENDER, P.J.E., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED AUGUST 22, 2022**

Appellant/Defendant Weinstein Appraisal Group, Inc. ("WAG") appeals from the judgment entered in the Court of Common Pleas of Schuylkill County awarding Appellee/Plaintiff Alan Kaplan $80,000, plus fourteen years' pre-judgment interest, under the parties' 2006 Employment Agreement, after finding that WAG had terminated Kaplan involuntarily and without just cause. Chief among WAG's several contentions are that the trial court misapplied Pa.R.Civ.P. 218 in the wake of Kaplan's failure to appear at trial and rendered a judgment against what he maintains was the weight of evidence showing that Kaplan left employment voluntarily.  After careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

We take the underlying facts and procedural history from both our review of the certified record and the trial court's opinion, the latter of which reflects the court's credibility determinations with respect to both the 2006 Employment Agreement at issue and Mr. Kaplan's entitlements and responsibilities under said agreement. The trial court's opinion provides, as follows:

> This case involved an employment contract and the central issue was whether the employee was involuntarily and improperly terminated without just cause and entitled to one year's annual salary due under the contract, or whether the employee left employment voluntarily.
>
> [The trial court] scheduled a bench trial to begin on August 3, 2020. Plaintiff Alan Kaplan and his counsel failed to appear. Defendants appeared with counsel. [The trial court was] able to contact Plaintiff's counsel via telephone. Attorney Stephen Carpenito ("Attorney Carpenito") informed the court that he had not received the scheduling Order. Counsel for the Defendants, Attorney Robert Kelly ("Attorney Kelly") asked for a nonsuit.
>
> [The trial court noted that the scheduling order was entered on June 24, 2020.] After further argument [in which the trial court permitted Attorney Carpenito to participate by telephone and offer his explanation for failing to appear], the trial court denied the motion for nonsuit, [advised Attorney Carpenito to be prepared to present his case the following day before terminating the phone call with him, and] permitted Attorney Kelly to proceed [*ex parte*] immediately with the Defendants' counterclaim [seeking from Kaplan repayment of advanced income paid to him during his nine months of employment.]
>
> Elliott Weinstein ("Weinstein") testified that he is the President of the Defendants, Weinstein Appraisal Group ("WAG"). He is a Pennsylvania certified general appraiser and has known the Plaintiff, Alan Kaplan ("Kaplan") for years.

- 2 -

After several meetings to discuss possible employment with WAG, WAG hired Kaplan as of February 27, 2006 and the parties entered into an Independent Contractor Agreement ("2006 Agreement"). Weinstein explained that WAG has two separate divisions, a realty advisor group and an appraisal group[, and that Kaplan was hired to head the appraisal group]. After explaining how Kaplan was paid $80,000 annually or $6,667.00 per month, Weinstein testified that Kaplan quit on March 9, 2007.

Weinstein explained that at the end of the first year of Kaplan's employment, the [appraisal] division lost money and Kaplan did not earn anything. Weinstein [testified WAG] would not have pursued Kaplan for the money [via its counterclaim suit] except for the fact that Kaplan had sued him. Weinstein seeks $58,077.00 as counterclaim damages.

The next day, Kaplan appeared and presented his case [through Attorney Carpenito]. [Kaplan testified] that he is a state-certified general real estate appraiser in several states and is also a Pennsylvania real estate broker. He earned the highest designation for his profession, "MAI", in the mid-1990s.

Kaplan has known Weinstein for years and the two had discussed employment of Kaplan by Weinstein in 2005 or 2006. Kaplan had a business called The Appraisal Shop, located in Frackville, Pennsylvania. Kaplan did [appraisal] work for Weinstein prior to being hired on February 27, 2006.

The term of the final version of the contract (three contracts dated February 27, 2006 were introduced into evidence but only the final one is relevant here) was from June 1, 2006 until termination. Kaplan started working in May and was to become a fulltime employee July 1, 2006, but that was moved up to June of 2006.

. . .

Kaplan believed he had a good relationship with Weinstein and WAG and proceeded to enter into employment negotiations. . . . Kaplan described his understanding of the work he was to do for WAG's appraisal division. All commercial appraisals were to be done through WAG, and Kaplan was to run that division and oversee the other appraisers or persons-in-training employed by WAG. Kaplan was also allowed to continue to do residential appraisals and other business work he had in Schuylkill County.

- 3 -

. . .

[Kaplan testified that discussions also addressed] Kaplan continuing his teaching job at Vintage Real Estate Academy. He typically taught Continuing Education classes for them on the weekends. Weinstein never objected to his teaching these classes.

Kaplan's understanding was that Weinstein intended to have 10-15 appraisers in his York, Pennsylvania office whom Kaplan would oversee. His position was Senior Vice President and his supervisor was Weinstein. Kaplan was to help develop and grow the business. From 2006 until February 2007, Kaplan travelled to York most of the time but did some work in Frackville. Kaplan was to be responsible for compliance and overseeing the appraisers and signing the appraisals.

Kaplan [testified] he was paid $6,667 per month and that he agreed to a staggered additional compensation percentage, meaning that as the volume of work went up, his percentage could increase. At first, work went well and work was being timely completed. Weinstein then hired another senior vice president but that person was not competent and was eventually terminated. . . .

Kaplan was familiar with the employee handbook and, until the end of February of 2007, did not receive any written notice that he was not following the employee handbook or was doing anything wrong. Kaplan continued to reside in Frackville with his family and was never told that he was expected to move to York.

During his testimony, Kaplan was presented with Plaintiff's Exhibit G, a purported warning letter [authored by Weinstein but never sent] dated February 19, 2007 stating that Kaplan had breached the Agreement, specifically paragraph 3, and demanding that he 1) resolve all Schuylkill County business interests existing prior to the Agreement and 2) terminate any additional employment with other employers (meaning his teaching position), while taking a six month leave of absence. If he failed to so agree by February 28, 2007, the Agreement would be terminated, and Kaplan would receive a $20,000 severance package.

Kaplan did not recall receiving this letter during his employment with WAG, and Weinstein stipulated that the letter was never given to Kaplan while he worked at WAG. Kaplan also recalled that he was not presented with the WAG employee [handbook] until months after he started. The handbook is dated September 1, 2006 and Kaplan signed it on September 11, 2006.

Kaplan had meetings with Weinstein and others at WAG several times each week. The first Kaplan became aware of any problem was January 8, 2007. Kaplan thought the business was doing very well, but was now being told that there would be no compensation bonus. Kaplan expected a production bonus but Weinstein and WAG prepared the financial statements so that no production bonus was reflected. Kaplan never received a bonus while working for WAG.

Kaplan questioned the financial statements because there were certain expenses on it such as the purchase of a vehicle that pushed the [appraisal] division's net income down purposefully. Kaplan was surprised as he expected to earn more. After the meeting on January 8, 2007, Kaplan went out to lunch with Weinstein and his wife, and Weinstein told Kaplan that Weinstein had a new plan to make more money [that involved changes to billing].

This was not the first time that WAG's business model was changing. WAG's business model changed every 90 days. They would clear the office and then hire four or five new people who had to be trained and who had inappropriate educational backgrounds and skills for appraisal work. After the third and fourth business plan, Kaplan got used to it. Weinstein intended to open more offices in other areas of the Commonwealth but that never came to fruition. Kaplan supervised anywhere from 2 to 5 appraisers during his time with WAG.

Kaplan testified that in the new business model presented in early 2007, everyone was moved to a salesperson position and was expected to do 90% in sales and 10% in appraisals. Kaplan questioned the plan as untenable.

During further meetings, Kaplan was given verbal ultimatums of giving up his other prior business and moving to York. Kaplan was presented with a new contract. Kaplan's staff was moved to

another room or floor of the office building. Kaplan was left with no staff. Weinstein terminated a very good appraiser.

Kaplan sent Weinstein a faxed memo on February 28, 2007. The memo outlines the ultimatums he had been given by Weinstein. The basic ultimatum was that everyone had to move to sales or leave. Kaplan wanted to continue to perform his duties as Senior Vice President of the appraisal division but he no longer had any appraisers to supervise, no staff and no appraisals to perform. Some employees stayed on and some left.

Kaplan was given 24 hours to decide whether to sign the new contract and move to York. At the time, Kaplan's family continued to live in Frackville and his wife was undergoing cancer treatments. Kaplan was then given a week to decide and could have six months to move to York. Kaplan's wife was hospitalized following most the treatments and Kaplan was unable to speak with her. Weinstein wanted Kaplan to close his appraisal business in Frackville and to sell his apartment buildings. Weinstein wanted the money Kaplan earned from teaching.

Kaplan did not want to terminate the existing Agreement and wanted to continue working. Under the new contract, many benefits would be lost including health care for Kaplan and his family, dues, travel expenses, and professional memberships.

After [Kaplan's] February 28, 2007 fax to Weinstein, they had several more meetings. Their last meeting was on March 2, 2007 in York.

Kaplan was told that his ideas to keep going were not going to work. Weinstein was not interested in any [of Kaplan's] creative solutions. Weinstein offered Kaplan $100,000 for 40 appraisals. When Kaplan asked what kind of appraisals, Weinstein told Kaplan to get his things and leave. When Kaplan asked for a severance, Weinstein became angry and cut the meeting off. It was clear to Kaplan that he had been terminated. Kaplan picked up his things and left. Kaplan sent a letter to the staff stating that his electronic signature was not to be used after March 2, 2007.

Kaplan never received two weeks' written notice required by the Agreement. Kaplan did not receive the $80,000 salary set forth in paragraph 5. Kaplan devoted sufficient time to WAG and did

not take on any new employment while a WAG employee. Kaplan honored the two year non-competition clause.

On cross-examination, Kaplan reiterated that he was fired on March 2, 2007. On March 6, 2007, he received a letter from a law firm on behalf of WAG directing him to return to work. [Kaplan had already told WAG that he had retained counsel]. Kaplan stated that he was fired in the same manner as other WAG employees and that he was involved in one termination which occurred the same way his did. Kaplan did not return to work because he would have had to sign a new "business requirements" contract and he did not agree with it.

Next, Attorney Ronald D. Butler ("Attorney Butler") testified. . . . He had no direct involvement with the hiring of Kaplan[,] but he did draft employee documents for Weinstein, [who would typically] use them as templates and modify them as needed.

Attorney Butler was contacted by Weinstein regarding Kaplan in mid-February of 2007. They discussed performance and non-performance issues[, but] the issue of firing Kaplan did not arise. . . . . [Butler testified that the] March 5, 2007 letter [was drafted at Weinstein's request] and was intended to set forth WAG's position on its dissatisfaction with Kaplan and request that he would return to work with additional duties.

Weinstein was then called to testify as of cross[-examination]. . . . [He testified that] WAG hired Kaplan as the senior vice president of WAG's appraisal group. Prior to that, he knew Kaplan and developed a relationship with him over several years. He signed the [2006 Employment] Agreement on behalf of WAG.

. . .

[Weinstein testified] that Kaplan was paid $6,667.00 per month as advance compensation. This could be considered a draw or a loan. At the end of 2006, Kaplan's goal of business revenue in excess of $750,000 was not going to be achieved. Weinstein admitted that he did not ask Kaplan to repay the loaned salary.

[According to Weinstein,] [c]oncerns arose in December of 2006 into January of 2007 [that,] [a]lthough the appraisal revenue was approximately $400,000 over the six month period since Kaplan started, it became dubious that Kaplan could achieve the goals set

- 7 -

forth the in the Agreement. If the revenue was less than $750,000, Kaplan would not be paid.

Weinstein agreed that Kaplan needed support staff and appraisers to do his job at WAG. Weinstein denied that he switched business plans or withdrew support staff and appraisers from Kaplan. Business was light, and WAG was more than capable of hiring more staff an appraisers [if needed].

Weinstein admitted that he received Kaplan's February 28, 2007 fax. Weinstein admitted that he did not respond to the fax in writing. Weinstein called Kaplan and asked for a meeting. They held a meeting on March 2, 2007. At the meeting, [according to Weinstein], Kaplan said his attorney told him just to listen and take notes. Kaplan then left[, Weinstein testified, saying] there was nothing left to say. Weinstein checked Kaplan's office and all of Kaplan's remaining personal possessions were removed.

Weinstein denied terminating Kaplan on March 2, 2007. . . . Weinstein testified that Kaplan had breached paragraph 3 of the Agreement because Kaplan was not devoting his entire time and attention to WAG. Weinstein admitted that he did not send the memo to Kaplan outlining the breaches and how to remedy them. Weinstein admitted that potential new agreements were presented to Kaplan[,] and [he claimed he] had confidence in Kaplan and remained open for discussion until March 15, 2007.

[Weinstein asserted] Kaplan had increasing family needs and a long commute, and Kaplan's family concerns had become his priority. [He] testified that he had asked Kaplan to move to York or at least closer several times prior. [He] denied giving Kaplan an ultimatum that he sign the new agreement or leave. . . . Weinstein agreed[, however,] that Kaplan said that he was being terminated.

[Weinstein testified that he] expected Kaplan to be present at work Monday through Friday and was surprised to learn at some point that Kaplan spent Thursdays out of the office teaching his classes. He considered that a breach of paragraph 3 [of the 2006 Agreement and its proviso prohibiting work for a different employer. Weinstein claimed that when he confronted Kaplan about this, Kaplan refused to quit teaching. Weinstein admitted, however, that there were no writings in Kaplan's file regarding Weinstein's concerns.]

- 8 -

Weinstein maintained, however, that Kaplan was not growing the business as they had discussed [and as also discussed in the Agreement, which contemplates revenues up to $2,000,000, Weinstein testified. So business growth was contemplated therein, he said.]

Weinstein admitted that Kaplan worked a total of eight months and nine days for WAG. The appraisal group's revenues were $460,201.61 for that time period, or for the last six months of 2006 [which, to the trial court's point, represented the more accurate time period in which Kaplan exercised supervisory control over a fully staffed appraisal division prior to the 2007 restructuring of the WAG business model and its reallocation of personnel to sales]. . . . However, [Weinstein testified,] that number had to be adjusted for employee expenses directly related to that division, and also for allocation of time and materials between divisions, ultimately resulting in a net loss to the entire company.

. . .

Gary Graham testified. Graham is the chief operating officer of WAG and has been employed by WAG for 28 years. [Graham testified that] Kaplan was not terminated at the March 2, 2007 meeting, which Graham also attended. [He explained that] WAG has a process for terminating WAG employees which includes requiring them to submit their building key and parking passes, to forward their emails, to end remote access to documents, and to have their voicemail terminated and forwarded to his extension. None of this happened to Kaplan on March 2, 2007. A departing employee is also generally accompanied to retrieve their personal possessions from their office. A WAG employee who was being terminated knew they were being terminated[, Graham said]; it would not be a matter of belief.

On cross[-examination], Graham did recall Kaplan saying that he had to sign the new agreement or he would be terminated. Graham did not recall seeing the March 5, 2007 Weinstein memo regarding the conditions under which Kaplan would remain employed by WAG.

. . .

After Defendants rested, the transcripts were prepared, the parties submitted proposed findings of fact and conclusions of law, and [the trial court] rendered a verdict in favor of the Plaintiff [Kaplan] in the amount of $80,000, which was, on June 23, 2021, molded to $148,133.70 to include [pre-judgment] interest.

[Specifically, the trial court] entered [its] verdict because [it] found the Plaintiff, Alan Kaplan, to be credible, and [it] found the testimony of Elliott Weinstein not to be credible. [The trial court offered the following account of the evidence as reason to support its decision:]

> The evidence showed that Kaplan was hired as senior vice-president of the appraisal division of WAG pursuant to the terms of the final [June 2006] Agreement. Kaplan attended weekly meetings, was never asked to do more than the work he had been doing, or to move, or to give up teaching, or anything else, until the end of 2006/early 2007.
>
> [At that time in early 2007], Kaplan believed that the appraisal division had performed well and that he was going to receive additional compensation. Instead, he was told that the division was operating at a loss and that he would have to agree to spend 90% of his time in business development and only 10% on appraisal work and staff management and supervisions, and sign a new contract to that effect. He was told he could not continue to work under the current contract and its terms.
>
> Weinstein was not able to explain adequately the profit and loss figures for the real estate appraisal division of his company, which Weinstein had printed from Quickbooks. At times, his testimony appeared to be directly contradictory to his prior testimony.
>
> In order to earn additional compensation, the Agreement calls for a minimum gross annual revenue for WAG of above $750,000. At the end of 2006, halfway through its fiscal year, the appraisal group alone had gross revenue of $460,210.61, which is more than half of that figure, but according to Weinstein, the appraisal division suffered a loss

- 10 -

because of all of the expenses of running the business of WAG.

Weinstein's testimony that Kaplan actually owed WAG money was simply not credible. Weinstein alone had the discretion as to how the expenses of the company and its divisions were to be allocated. Kaplan's testimony that Weinstein allocated the entire cost of a company vehicle to that one period of time demonstrates that Weinstein was possibly manipulating the numbers to make it appear that the appraisal division was not doing as well as Kaplan thought.

[The trial court] found credible Kaplan's testimony that he had to either agree to a new contract or be terminated. Graham heard Kaplan say that. Weinstein knew that Kaplan thought he was being terminated, and took no action, although he had authored a memo dated February 19, 2007 (that he never gave to Kaplan) setting forth Weinstein's position on the circumstances under which Kaplan could continue working. There was no evidence from either Plaintiff or Defendant that Kaplan could continue working under the terms of the [2006] Agreement.

Weinstein told Kaplan that it was either change to the new model or Weinstein would revert to the business model used before Kaplan was hired. Weinstein took away Kaplan's staff including his staff scheduler and the appraisers.

Kaplan sent Weinstein a fax on February 28, 2007 setting forth the circumstances as he understood them:

> that he was to move to a new business model; that his staff had been taken away; that he had to move to York (while his wife was battling cancer); and that he had to give up all other sources of income, including teaching and all of the other business work he was permitted to do

- 11 -

> under the current [2006] Agreement, or leave WAG.
>
> [The trial court] found credible Kaplan's testimony that he was told to leave during the March 2, 2007 meeting, after Kaplan requested a severance. Weinstein's subsequent actions were taken to make it look as if Kaplan had left of his own volition.
>
> The [2006] Agreement provides in paragraph 8 that if the Agreement "is terminated by Employer without just cause, Employer will compensate Employee in accordance with Paragraph 5 herein, for a period of (1) year from the date of written notice."
>
> [The trial court] found that Kaplan's February 28, 2007 fax to Weinstein was written notice that Kaplan was being terminated without just cause. [The trial court] found no evidence that Kaplan was being terminated for cause. For these reasons, we found in favor of the Plaintiff [Kaplan] on his claims in the amount of $80,000.00 and against WAG on its counterclaim.

Trial Court Opinion, 10/25/21, at 1-16. After the trial court's denial of WAG's post-trial motions, this appeal followed.

Appellant WAG presents the following questions for this Court's consideration:

> I.    Whether the trial court erred as a matter of law in not fully applying the provisions of Pa.R.C.P. 218 and granting Weinstein's Motion for a Nonsuit under Pa.R.C.P. 230.1 when the Plaintiff failed to appear at the call of the case for trial?
>
> II.   Whether the competent evidence in the record establishes that Kaplan's employment was terminated by Weinstein?
>
> III.  Whether the trial court erred as a matter of law in failing to apply an adverse inference against Kaplan as a result of his

- 12 -

failure to provide in discovery notes he took and maintained regarding the March 2, 2007 meeting?

IV. Whether the trial court erred as a matter of law in interpreting the advanced compensation provision in the employment agreement as a salary and awarding a severance a result?

V. Whether the trial court erred as a matter of law in denying Weinstein's counterclaim in the absence of any contrary evidence and when Weinstein met its burden of proof?

VI. Whether the trial court erred as a matter of law in awarding pre-judgment interest?

Brief for Appellant at 7-8.

WAG first contends the trial court erroneously made conflicting rulings under Pa.R.Civ.P. 218 in addressing Kaplan's failure to appear at the non-jury trial. Specifically, WAG asserts that both its motion for nonsuit regarding Kaplan's civil action and its motion to proceed *ex parte* on its own countersuit turned on what it views as the pivotal question in any Rule 218 inquiry, namely, whether a party is unready for trial without a satisfactory excuse. Because the trial court necessarily found Kaplan lacked a satisfactory excuse when it granted WAG's motion to proceed on the counterclaim, WAG maintains that a consistent application of Rule 218 required the trial court to grant WAG's motion for nonsuit on the same underlying finding. We disagree with WAG's interpretation of Rule 218.

"To the extent [an] issue[] involve[s] interpretation and application of the Rules of Civil Procedure, which are questions of law, we employ a *de novo* standard of review and plenary scope of review." **C.H.Z. v. A.J.Y.**, 262 A.3d 604, 607 (Pa. Super. 2021). **See also Jones v. Riviera**, 866 A.2d 1148, 1150 (Pa. Super. 2005).

Rule 218 provides, in relevant part:

**Rule 218. Party Not Ready When Case is Called for Trial**

(a) Where a case is called for trial, if without satisfactory excuse a plaintiff is not ready, the court may enter a nonsuit on motion of the defendant or a *non pros* on the court's own motion.

(b) If without satisfactory excuse a defendant is not ready, the plaintiff may

(1) proceed to trial . . . .

(c) A party who fails to appear for trial shall be deemed to be not ready without satisfactory excuse.

*Note:* The mere failure to appear for trial is a ground for the entry of a nonsuit or a judgment of *non pros* or the reinstatement of a compulsory arbitration award.

A nonsuit is subject to the filing of a motion under Rule 227.1(a)(3) for post-trial relief to remove the nonsuit and a judgment of *non pros* is subject to the filing of a petition under Rule 3051 for relief from a judgment of *non pros*.

. . . .

Pa.R.C.P. No. 218 and explanatory note.

Read in its entirety, Rule 218 permits, but does not require, entry of nonsuit for a plaintiff's failure to appear at trial. The ultimate decision in this regard is left to the sound discretion of the trial court, as the rule plainly

- 14 -

provides that a court "*may* enter a nonsuit or a judgment of *non pros*" if, without satisfactory excuse, a plaintiff is not ready. Rule 218(a) (emphasis added).[1]

Such permissive language reflects the intent to give an option to, rather than to impose an obligation upon, the court, and nowhere in the remainder of the rule is the court's exercise of discretion under subsection (a) specifically qualified or limited. *See Lorino v. Workers' Comp. Appeal Bd.*, 266 A.3d 487, 493 (Pa. 2021) ("The term 'shall' establishes a mandatory duty, whereas the term 'may' connotes an act that is permissive, but not mandated or required."); *Oberneder v. Link Computer Corp.*, 696 A.2d 148, 150 (Pa. 1997) ("The statutory word 'may' as contrasted with 'shall' signals a discretionary rather than a mandatory act.") (citing 1 Pa.C.S. § 1921(b)). If

---

[1] Pursuant to subsection (c), failing to appear is *per se* unreadiness without a satisfactory excuse, and the explanatory note further clarifies that the failure to appear is a ground for, *inter alia*, nonsuit or *non pros*. There is no dispute that Kaplan failed to appear for the first day of his non-jury trial.

the rule required the sanction of nonsuit whenever plaintiffs lack a satisfactory excuse for failing to appear at trial, its words would indicate so. [2, 3]

---

[2] In fact, WAG actually rewrites Rule 218 to make its argument. Specifically, WAG writes:

> The words of Rule 218 are clear that unless a "satisfactory excuse" exists when a plaintiff is not ready when a case is called to trial the entry of nonsuit or *non pros* is the appropriate remedy.

Brief of Appellant at 41. This, of course, is not the language of Rule 218. Rule 218 states not that nonsuit or *non pros* is *the* appropriate remedy for failing to appear, but only that failing to appear provides a ground for nonsuit or *non pros*, sanctions to which a court *may* resort.

[3] WAG directs us to no controlling decision, and we are aware of none, that interprets Rule 218(a) and (c) to require a trial court to grant a defense motion for nonsuit or to enter judgment *non pros* when a plaintiff fails to appear for trial. Instead, our decisions have recognized only that the rule confers authority upon a trial court to enter nonsuit in the exercise of its discretion. *See*, *e.g.*, *Frempong v. Phillips*, 272 A.3d 485 at *3 (Pa. Super. filed January 19, 2022) (non-precedential decision cited for its observation that Rule 218(a) and (c) "state[] that a trial court *may* enter a judgment of *non pros* against a plaintiff who fails to appear for trial.") (emphasis added); *Allen v. Herr*, 264 A.3d 376 at *3 (non-precedential decision cited for its observation that "Rule 218(a) *permits* a court to enter a judgment of *non pros* on its own motion . . . .") (emphasis added); *Valle v. Margle*, 241 A.3d 372, at *3 (Pa. Super. filed Oct. 7, 2020) (non-precedential decision cited for its acknowledgment, in *dicta*, that a court *may* enter nonsuit for a plaintiff's failure to appear at trial).

Recognizing the discretion afforded a trial court by Rule 218(a) and (c) is not only supported by the plain wording of the rule itself but also consonant with related rules of civil procedure and interpretive decisional law permitting a trial court to open a judgment of *non pros* upon its consideration of a plaintiff's explanation for failing to appear and other relevant factors. *See Faison v. Turner*, 858 A.2d 1244, 1246-47 (Pa. Super. 2004) (setting forth factors a trial court should consider when determining whether a failure to appear should be excused); *Petrone v. Whirlwind*, *Inc.*, 664 A.2d 172, 175 (Pa. Super. 1995) (identifying a distinction between a "sufficient excuse for failing

*(Footnote Continued Next Page)*

In contrast, when addressing a defendant's failure to appear, Rule 218 is worded not in terms of what the trial court may do but, instead, in terms of what the plaintiff may do. Specifically, subsection (b) provides that a "plaintiff may proceed to trial" if a defendant is without a satisfactory excuse for being unready. Rule 218(b). In granting WAG's request to proceed with an *ex parte* presentation of its case in counterclaim, the trial court again simply followed the prescription of Rule 218.

The record before us demonstrates the trial court's recognition that Rule 218 prescribes different options and procedures depending on whether the non-attending party is a plaintiff or a defendant. For the reasons discussed, we conclude that no error attended the trial court's decision to allow WAG to proceed unilaterally and *ex parte* on its counterclaim but to deny WAG's motion for nonsuit regarding Kaplan's claim.

---

to appear" and an excuse which may "at the least [be sufficient] to avoid a *non pros*."); **Banks v. Cooper**, 171 A.3d 798 (Pa. Super. 2017) (relying on **Petrone** in holding trial court erroneously entered order denying plaintiffs' petition to open judgment of *non pros* without first considering counsel's explanation for not appearing at trial and other factors that could suffice to avoid judgment of *non pros*).

In this regard, we note that prior to denying the motion for nonsuit, the trial court in the case *sub judice* received information correlating to the **Faison** factors, such as counsel's explanation that he failed to appear because neither he nor his staff received the order for trial, that in 25 years he has never before failed to appear for trial, that he intended no delay, and that he was prepared for trial, which the court ordered would commence the next morning.

In WAG's second issue, it argues that the trial court erred in concluding Kaplan had been involuntarily terminated when the record demonstrated that Kaplan simply quit.[4] In so claiming, WAG essentially challenges the trial court's determinations as to witness credibility and the weight of the evidence.

> Our review in a non-jury case is limited to "whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law." ***Bonenberger v. Nationwide Mut. Ins. Co.***, [ ] 791 A.2d 378, 380 ([Pa. Super.] 2002). We must grant the court's findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the non-jury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. ***See Terletsky*** [***v. Prudential Property & Casualty Ins. Co.***], 649 A.2d [680,] 686 [(Pa. Super. 1994)]. It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the factfinder. ***See Bonenberger***, 791 A.2d at 381. Thus, the test we apply is "not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion." ***Bergman v. United Servs. Auto. Ass'n***, [ ] 742 A.2d 1101, 1104 ([Pa. Super.] 1999).

***Hollock v. Erie Ins. Exch.***, 842 A.2d 409, 413-14 (Pa. Super. 2004).

According to WAG, the trial court's conclusion that Mr. Kaplan provided credible testimony on the issue of termination, while Mr. Weinstein's related testimony proved incredible, finds no support in the record. To this point, WAG posits that the court's Pa.R.A.P. 1925(a) opinion fails to refer to specific

_____

[4] WAG has subsumed within this issue its third enumerated issue pertaining to the court's refusal to apply an adverse inference to Kaplan's failure to produce the notes from the March 2, 2007 meeting.

aspects of the parties' testimonies that uphold the court's credibility determinations and offers, instead, only generalized, "conclusionary" statements without reference to competent evidence.

WAG, therefore, asks this Court to conduct an independent review of the record to determine what the controlling and credible facts of the case *sub judice*. *See*, *e.g.*, *Puleo v. Thomas*, 624 A.2d 1075, 1077 (Pa. Super. 1993) (holding where trial court "is deficient in failing to detail factual findings in a manner which will permit meaningful review", a reviewing court may perform such review). In this vein, WAG directs us to those parts of the record which, it believes, established that Mr. Kaplan was not involuntarily terminated.

First offered is the trial court's finding that "Kaplan's February 28, 2007 fax to Weinstein was written notice that Kaplan was being terminated without just cause." *See* TCO at 16. WAG assails this conclusion as both nonsensical, as one cannot author a written notice of one's own involuntary termination, and illogical, because Kaplan's fax referred to a tentative agreement to attempt resolution in the coming weeks. Brief of Appellant, at 46. Moreover, WAG points to Kaplan's own testimony that he was terminated several days later at the March 2nd meeting as inconsistent with the court's conclusion that the February 27th fax supplied such notice.

Kaplan responds that ample evidence admitted at trial supported the trial court's determination that he was involuntarily terminated without cause on March 2, 2007, when Weinstein refused to reconsider decisions that Kaplan had memorialized in his fax and, instead, settled on his executive plan to

restructure WAG to the demise of Kaplan's appraisal division and, consequently, the 2006 Employment Agreement. N.T., 8/4/20, at 95-125.

For example, Kaplan alludes to his testimony regarding the early 2007 meetings where Weinstein announced the business model would change to a 90% sales/10% appraisals split. N.T., 8/4/20, at 94, 103, 105. Repurposing his staff in this manner, Kaplan testified, deprived him of the in-house workforce needed to write the number of appraisals necessary to meet the stated goals of the Employment Agreement. N.T. 8/4/20 at 99. This fundamental change in the business model, therefore, completely frustrated the purpose of the Employment Agreement he had entered with WAG.

To both memorialize his understanding of Weinstein's new proposals/demands and express his resulting concerns, Kaplan wrote his fax of February 27, 2007, which stated as follows:

> I just wanted to commit to writing my understanding right now. Weinstein Appraisal Group has moved to a business development model. The staff appraisers were given a choice of going into business development, with a specialty or leaving the company.
>
> Under the business development, the staff reports to Gary [Graham] and there is currently no specialty work booked. Kaylee has moved upstairs [with sales] and Leslie, although physically downstairs, is working for upstairs.
>
> This effectively leaves my department with no employees. I am ready, willing, and able to perform my duties under my current contract, however, there is no work for me in terms of supervising appraisers. . . .
>
> I am not required to be in York at this time [under the 2006 contract] except for Monday morning business development

meetings and so I have moved my computer equipment back to Frackville per your statement.

The choices you have given me at this time are to stay with my current contract, however, my job would be 90% business development (sales) not appraisal work, I would be required to move to York immediately (6 months), and give up all other sources of income or leave the company. . . .

I have requested we come up with a creative solution. You have given me two proposals, one for the short term, 1 year, and one for long term. These are in draft and we are both seeking legal advice, which will take some time, to find a workable solution. We tentatively agreed to try and resolve by March 15th. In the meantime, if any of us has some creative alternatives we are to bring these ideas up for discussion so we can resolve this amicably.

If this is not the case please let me know.

Kaplan Faxed Memo dated 2/27/2007.

Whether the fax served as "actual notice" of Kaplan's involuntary termination is beside the point. The import of the trial court's opinion is, instead, that the court accepted Kaplan's fax and trial testimony regarding the subsequent March 2, 2007 meeting as fair, accurate, and consistent accounts of Weinstein's unilateral decision to depart from the terms of the 2006 Employment Agreement in favor of forming a revised plan that eliminated Kaplan's appraisal division and wholly redefined Kaplan's role at WAG.

Cited in the fax were how new demands upon Kaplan reinforced the termination of both the 2006 Agreement and the understanding between Kaplan and Weinstein as to how Kaplan otherwise had been conducting his personal and professional affairs while the Agreement was in effect. For the first time, Weinstein now insisted Kaplan move to York despite knowing Kaplan

- 21 -

and his wife faced difficulties associated with her lymphoma diagnosis and treatment. N.T. at 105-106. He also required Kaplan to end well-known, longstanding business interests that had not been prohibited in the 2006 Agreement but were now referenced as breaches of the 2006 Agreement, take on new obligations in their stead, and turn over all income earned from teaching. N.T. at 107-116.

Each of Weinstein's newly proposed agreements referenced in Kaplan's fax explicitly stated "employee and employer ratified an Employment Agreement in June, 2006, that both employee and employer mutually agree is hereby deemed null and void with no additional rights or obligations of either employee or employer." N.T. at 113-14. Corresponding to these proposed agreements, moreover, was the March 5, 2007 letter from Weinstein's attorney reiterating that Weinstein sought to modify the Employment Agreement and conditioned Kaplan's continued employment on his acceptance of six conditions, most of which were contained in the proposed agreements. N.T. at 114-120

Therefore, we find that the trial court opinion clearly explains that it accepted as true the factual account Kaplan offered in both his fax and trial testimony and that it viewed such facts as supporting Kaplan's perception that he was no longer the head of WAG's appraisal division as had been contemplated in the February 26, 2006 Employment Agreement. The combination of fundamental changes to WAG's business model, the resultant elimination of Kaplan's appraisal staff, the redefining of Kaplan's

responsibilities as comprising 90% sales and only 10% appraisals, and the introduction of new obligations that would bear significantly on his professional and personal life completely frustrated the purpose of the 2006 Employment Agreement and effected a *de facto*, no-cause termination of Kaplan's position as WAG's head of the appraisal division. Accordingly, we discern no merit to WAG's contention otherwise. [5, 6]

---

[5] We note, further, that the same references to the record supplied the trial court with specific evidentiary basis to support its determination, thus belying WAG's claim of a generalized, non-specific trial court rationale undeserving of this Court's deference under our traditional weight-of-the-evidence standard of review.

[6] WAG offers several additional, ancillary arguments aimed at the court's credibility determinations.

First, WAG argues that if Kaplan truly wished to remain an employee at WAG but incorrectly believed he had been terminated, then his response to Mr. Weinstein's subsequent assertion at the March 2nd meeting that he had not been terminated would have been to return to work "expressing appreciation and thanks that he still had a job." Brief for Appellant at 48. Kaplan's failure to do so provides another example of how the trial court's opinion that Kaplan was involuntarily terminated lacks logic, WAG maintains.

This passage ignores the trial court's observation, however, that it was precisely the comprehensive changes Weinstein was imposing that left Kaplan without the "job" he was given by virtue of the 2006 Employment Agreement.

WAG's criticism of the trial court's decision also relies on the testimony of Weinstein and Graham that none of the protocols followed by WAG in the event of an employee's termination, such as confiscation of keys and being escorted from the building, was undertaken on March 2, 2007.

The absence of such formalities would be relevant in a case involving an allegation of overt firing. Here, however, Kaplan's theory always has been that Weinstein's actions and the necessary consequences of such actions,
*(Footnote Continued Next Page)*

As noted, WAG argues that Kaplan's testimony regarding the parties' actions and statements made during the March 2, 2007 meeting should have been viewed in light of an adverse inference against Kaplan for his failure to comply with defense counsel's discovery request to produce his written notes of the meeting.[7] Specifically, the trial court found that Kaplan possessed the notes, admitted he had referred to his notes prior to trial to refresh his memory of the March 2, 2007 meeting, and failed to provide the notes to defense counsel. Yet, WAG complains, the trial court declined to apply an adverse inference that the notes would have been unfavorable to Kaplan had he produced them at trial.

> As an appellate court, we review the trial court's application of relevance and prejudice standards for abuse of discretion. **Commonwealth v. Tyson**, 119 A.3d 353, 357 (Pa. Super. 2015). "[A]n abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will[,] or partiality, as shown by the evidence or the record." **Commonwealth v. Cameron**, 780 A.2d 688, 692 (Pa. Super. 2001).

---

taken together as described, amounted to the elimination of Kaplan's position created in the 2006 Agreement. We therefore agree with Kaplan's argument on this point that the absence of formal, explicit protocols normally associated with an overt termination was not relevant to, let alone dispositive of, the issue presented in the case *sub judice*.

[7] As noted previously, WAG presents its adverse inference argument as its third enumerated question presented, but there is no corresponding argument section delineated in WAG's Brief for Appellant. For ease of discussion, therefore, we address this question within the context of the trial court's findings of fact and credibility determinations as they related to the central issue before us, *i.e.*, whether WAG terminated Kaplan by unilaterally dissolving the 2006 Employment Agreement.

*Hammons v. Ethicon, Inc.*, 190 A.3d 1248, 1282 (2018), *aff'd*, 240 A.3d 537 (Pa. 2020).

In non-jury trials, we presume the court is "imbued with the knowledge of the law that he would have given in a formal charge in a jury case." *Id.* at 1280 (citations omitted).  Here, the trial court was therefore "imbued with the knowledge of the law" on spoliation of or the conscious failure to produce evidence and the sanction of an adverse inference instruction that informs a jury/finder of fact it may infer, if it chooses to do so, "that the destroyed evidence would have been unfavorable to the position of the offending party." *Id.* at 1280-81.   The rationale for this inference is "nothing more than the commonsense observation that a party who has notice that evidence is relevant to litigation and who proceeds to destroy evidence is more likely to have been threatened by" the proof in question.  *Id* at 1281 (quoting *Parr v. Ford Motor Co.*, 109 A.3d 682,  (Pa. Super. 2014)).

We find no error with the court's decision against applying an adverse inference with respect to Kaplan's notes of the March 2, 2007 meeting with Weinstein.  Acting as the finder of fact, the trial court was free to choose whether or not to infer from Kaplan's failure to produce his notes of the March 2, 2007 meeting that the notes were unfavorable to him.

In examining both the record and the trial court's opinion, we see the trial court carefully considered the extensive testimonies presented by both parties that centered on the timeframe proximate to the March 2, 2017

meeting in question and determined, on this basis, that an adverse inference was not warranted.

Specifically, the trial court found that given the continuity of Weinstein's standpoint with respect to Kaplan both before and after the March 2, 2017 meeting, it was reasonable to conclude he had said nothing during the March 2, 2017 meeting to alter his plans for restructuring WAG and significantly changing Kaplan's role within WAG in the process. In the trial court's granular review of the competing testimonies between Kaplan and Weinstein, it noted Kaplan's testimony remained consistent with his prior assertions and observations made in the memo he faxed to Weinstein just days before the meeting, whereas Weinstein was at times self-contradictory and incredible. Our review of this record reveals no reason to disturb the trial court's exercise of discretion in this instance.

In WAG's third issue, it contends the trial court misread and misunderstood the 2006 Employment Agreement when it found Kaplan was entitled under the Agreement's terms to a severance payment equal to his annual salary of $80,000. We disagree.

Because contract interpretation is a question of law, our standard of review is *de novo*, and the scope of review is plenary. ***Ragnar Benson Inc. v. Hempfield Twp. Mun. Auth.***, 916 A.2d 1183, 1188 (Pa. Super. 2007).

Our Supreme Court has set forth the principles governing contract interpretation as follows:

> The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself. Under ordinary principles of contract interpretation, the agreement is to be construed against its drafter. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.

*Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468-69 (Pa. 2006) (citations omitted).

As it did at trial, WAG asserts that Kaplan had no contractual claim to compensation-based severance pay because under the compensation formula set forth in the Agreement's Paragraph 5(a), Kaplan was actually entitled to $0 annual compensation. This was so, WAG explained, because Kaplan's annual compensation was based on the net operating income he generated, and the appraisal division under his leadership had realized net operating income of less than $0 to that point in the fiscal year.

The trial court noted its skepticism of WAG's computations, however, observing first that Kaplan's division had earned well over $400,000 in gross revenues in its first six months, which was at least on schedule, if not ahead of schedule, to meet the first year goal of $750,000 it had been assigned. The idea that WAG had set a goal only to say later that work performed at a pace to meet the goal had generated no net income and, thus, entitled Kaplan to no annual compensation was highly suspect to the trial court.

The trial court thus focused on evidence that Weinstein was engaging in behavior that both interfered with the appraisal division's ability to earn gross

revenues and added questionable expenses that served to reduce the division's net operating income..  Specifically noted in this regard were Weinstein's routine changing of personnel, his frequent adoption of new business plans within the appraisal division's ranks, and his unilateral control over expenditures—including his purchase of a new luxury vehicle that Kaplan denounced as unnecessary.

Therefore, the trial court's conclusion that Kaplan was entitled to a severance payment equal to his annualized payment of advanced compensation under the Agreement did not reflect a "misunderstanding" of the Employment Agreement's scheme for computing employee compensation and determining eligibility for compensation-based severance pay.  Rather, it reflected the trial court's reasonable rejection of WAG's evidence that Kaplan had earned $0 in net operating income despite evidence that he was on pace to meet goals.  To support this conclusion, the trial court made findings of fact that Weinstein had manipulated—whether intentionally or inadvertently—calculations necessary to the computation scheme by adversely affecting both the revenue and expense side of the appraisal division's ledger.  We discern no error with the court's doing so.[8]

_____

[8]  Our determination that Kaplan was entitled to severance pay likewise resolves in Kaplan's favor WAG's fifth enumerated question presented (addressed in Roman numeral IV of WAG's argument section), claiming the court erred in denying its counterclaim seeking recovery of Kaplan's advanced compensation.

Finally, WAG contends that even if Kaplan were entitled to severance pay, he would be entitled only to 9/12ths of the $80,000 in advance payments he would have received had he worked the full year. We find this assertion in conflict with Paragraph 8 of the Agreement, which provides, in pertinent part, "If this Agreement is terminated by Employer without just cause, Employer will compensate Employee in accordance with Paragraph 5 herein, for a period of one (1) year from date of written notice."

Contrary to WAG's argument, the Agreement does not state that Kaplan will receive a severance pay equal to the pay he received over the previous year. Instead, it says WAG will compensate him for a period of one year in accordance with the rate identified in Paragraph 5.[9] Paragraph 5(c) sets forth that WAG "agrees to monthly advance compensation payments" to Kaplan "at a minimum of $6,667 per month ($80,000 annualized)." Therefore, under this Paragraph 5 advance compensation formula, it was appropriate for the trial court to award Kaplan an $80,000 severance payment.

In WAG's final argument, it submits that the trial court erred in awarding pre-judgment interest because the amount of severance was not a set sum.

---

[9] As the trial court had already determined that the net operating income amounts relevant to the present matter were unreliable for purposes of calculating Kaplan's compensation pursuant to Paragraph 5(a), it was reasonable for the court to refer to Paragraph 5(c) to ascertain Kaplan's contractual compensation for purposes of this action. Further supporting the court's use of Kaplan's advance compensation for this purpose was Weinstein's testimony that it was the practice of WAG to allow terminated employees to keep as their compensation the advances they received during their employ.

- 29 -

In framing its position, WAG alludes to decisional law holding that the amount in controversy must be either a fixed sum or a sum mathematically ascertainable before pre-judgment interest may attach. Brief for Appellant at 68, *citing* **Frank B. Bozzo Inc. v. Electric Weld Division**, 498 A.2d 895, 899 (Pa. Super. 1985). Where, however, the contract action is to recover an amount unascertainable, the defendant is unable to make a tender because he does not know what amount will satisfy his obligation. ***Id***.

As explained above, we concur with the trial court's conclusion that the severance award owed Kaplan is $80,000.00, which is a discernable, fixed amount under the Employment Agreement. Under the authority relied upon by WAG, it follows that pre-judgment interest is recoverable in the present case.

For the foregoing reasons, we AFFIRM.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/22/2022